**ALGEMEENE KUNSTZIJDE UNIE, N. V., a corporation organized under the laws of The Netherlands, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1236.**

United States District Court,
W. D. North Carolina,
Asheville Division.

Dec. 31, 1954.

George E. Cleary, George Stinson, New York City, Gaylord Davis, Asheville, N. C., Bernard & Parker, Asheville, N. C., for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Homer R. Miller, Richard S. Larson, Special Asst. to the Atty. Gen., James M. Baley, Jr., U. S. Atty., Asheville, N. C., for defendant.

WARLICK, District Judge.

This is an action for the refund of income taxes alleged to have been erroneously collected by the United States for the years 1945 and 1946. The amount directly involved in this action is $198,060.56, plus interest,— $87,658.47 being claimed for the year 1945 and $110,402.09 for the year 1946. The cause was heard on a series of stipulated facts and upon the oral testimony of two witnesses. The facts are generally undisputed.

The following findings of fact are made:

Plaintiff at all times material to this proceeding and thereafter, is and was a corporation organized under the laws of The Netherlands with its European business headquarters located in Arnhem, Holland, and maintains its principal office in the United States at 23 Flint Street, Asheville, and is a resident of the Western District of North Carolina. It was domesticated under the laws of North Carolina in the year 1936. Since that date plaintiff has been engaged in business in the United States within the meaning of Section 231 of the Internal Revenue Code, 26 U.S.C.A. § 231, and has continuously maintained a General Agent at the above address, with power sufficiently broad to represent it.

Plaintiff has carried on two general lines of activity in the United States: One, as a regular importer of textile products from its mills in Europe for sale here; and secondly, plaintiff owned directly and indirectly the controlling stock interest in three American corporations,—North American Rayon Corporation, American Bemberg Corporation, and American Enka Corporation, all three of which are principally engaged in the manufacture and sale of viscose and textile yarns.

During the years of 1945 and 1946 and subsequently thereto, plaintiff received substantial dividends from the stocks which it owned in the above named American corporations and derived a considerable sum from its yarn importation, and in turn reported these incomes for tax purposes. Additionally plaintiff purchased extensive machinery and equipment during these years in this country.

Prior to and on August 9, 1947, plaintiff was the owner of the following shares of stock, among other properties in the United States, all capital assets and held for more than six months as defined in 117 Internal Revenue Code:

167,596 shares of Class A, no par value, Common Stock of North American Rayon Corporation, a corporation organized under the laws of the State of Delaware;

2,003 Certificates of beneficial interest for shares of Class A, no par value, Common Stock of said North American Rayon Corporation;

77,645 shares of Class B, no par value, Common Stock of said North American Rayon Corporation;

33,314 shares of Common Stock, no par value, of American Bemberg Corporation, a corporation organized under the laws of the State of Delaware;

15,111 shares of Class B, no par value, Common Stock, of said American Bemberg Corporation;

3,572 shares of 4½% Preferred Stock, $100 par value, of said American Bemberg Corporation;

2,530 Certificates of beneficial interest for shares of 4½% Preferred Stock, $100 par value, of said American Bemberg Corporation.

The stocks listed above had a basis to the plaintiff for determining loss of not less than $16,800,000.

Plaintiff has far flung business enterprises with affiliates in many of the countries of Europe and elsewhere, and its stock was widely held and owned by many individuals and corporations, nationals of The Netherlands and of countries other than Germany and those allied with her in World War II. A minority interest of capital stock of plaintiff prior to the outbreak of World War II in 1939 was owned by German nationals, but on account of the stock certificates being payable to bearer, and called "bearer shares", it could not be determined with absolute accuracy the actual percentage of stock owned at that time by the Germans. As complete an investigation as could be made determined that something in the neighborhood of 26–30% would fully reckon for all of the outstanding capital stock

of the plaintiff owned by German nationals. Prior to the actual outbreak of war in Europe in 1939, certain nationals of Germany held membership on plaintiff's Board of Directors, but at no time was there a German majority control of said Board. Subsequently, on November 15, 1939, all German representatives on the Board were removed, and thereby eliminated from any control in the management of the affairs of the plaintiff.

Prior to 1939 the ultimate control of plaintiff's affairs was vested in the preferred and common stockholders, the great majority being Dutch nationals. Following the surrender of Germany, plaintiff's stock has been owned and its affairs managed and controlled by individuals who are citizens of countries other than Germany and her allies, and at this time and for a good many years previous, substantial amounts of stock are owned by the citizens of the United States.

One recalls that on May 10, 1940, the Kingdom of The Netherlands was invaded and occupied by the military forces of Germany, and that the most ruthless and brutal efforts of Germany's long desire to conquer the world were brought to bear upon those helpless individuals who made up the citizenship of Holland. On May 24, 1940, Queen Wilhelmina, by Royal Decree A–1, vested in her government for safe keeping, full title to all assets of Dutch nationals located in the United States, which included all assets of plaintiff located as such, and which embraced the shares of stock herein set out. On October 20, 1944, by Royal Decree E–133, The Netherlands government, through its Queen, vested in itself along with other items embraced in said decree, the outstanding corporate stocks of all Dutch corporations which were owned by the nationals of Germany and other Axis powers, and under this decree there was vested in The Netherlands government all of the outstanding capital stock of the plaintiff which was owned by German nationals,

and her Axis allies. This decree was sufficiently broad to include all of the shares of stock in the plaintiff which had been acquired by German nationals during the period in which Holland was occupied by the invading German forces. These decrees were based upon the state of war which was declared on May 10, 1940, on the invasion of Holland, and this state of war continued until May 3, 1945, following the Dutch liberation.

On account of the occupation of Holland by the German forces, during the above dates, it was under certain laws of the United States classified as enemy-occupied territory.

Following the declaration of war by the United States, certain of its officials in the office of Alien Property began to investigate the assets and affairs of the plaintiff which were located in the United States with the thought in mind of determining their possible seizure, under the Trading with the Enemy Act. 50 U.S.C.App. §§ 17 through 40, 50 U.S.C.A.Appendix, §§ 17–40. These investigations continued, but in view of certain requests made by the government of The Netherlands, and in line with its dealing with friendly aliens, no definite and final action was taken by our government until the end of hostilities. Thereupon certain representatives of the office of Alien Property began negotiations with representatives of plaintiff. Various positions were taken with the defendant contending that the property was subject to vesting under the Trading with the Enemy Act on the ground, among other things, that plaintiff was, prior to the outbreak of World War II, controlled by German nationals. Other contentions were made, all of which were vigorously opposed, and The Netherlands government actively intervened in the plaintiff's behalf with discussions continuing over a period of approximately two years, and which finally culminated in the execution on August 9, 1947, of the agreement hereto attached and which had the force and effect of:

vesting of title in the United States to the stocks set out above.

By this agreement the stocks listed above and having a basis to plaintiff for determining loss of not less than $16,800,000 were vested in the Attorney General of the United States and the same were subsequently sold, together with certain other shares of stock seized from two other foreign corporations for $17,111,126 and upon delivery of said stock as it had contracted to do, plaintiff, on December 31, 1947, had no claim against the United States or against any other source for reimbursement for the loss which it suffered on the seizure and vesting of the stock listed above.

Pending the negotiations which resulted in the execution of the contract through which the stock vested in the Attorney General, officials of The Netherlands government were closely advised and constantly kept in contact with the conferences and meetings and in line with the vesting of said stock in the Attorney General, The Netherlands government made certain oral representations to the plaintiff that said government would on the happening of certain conditions, make payments to the plaintiff from stocks it had seized belonging to German nationals and located in Holland, to partially reimburse the plaintiff and recompense it for the loss which it suffered from the seizure of the stocks herein set out; eventually in 1951, pursuant to that agreement there was paid plaintiff by The Netherlands government a certain amount of florins, which under the then prevailing rate of exchange gave to the plaintiff the equivalent of $6,263,610.53, which decreased its loss through the seizure and the subsequent agreement to approximately $10,166,000.

Plaintiff's corporate issue stock consisted of the following shares:

Common shares 102,545,500

Cumulative preferred shares 1,782,000

Priority shares 48,000

Obviously none of these shares were seized by or vested in the United States or any of its agencies. Plaintiff kept its records and filed its income tax returns for the years 1945, 1946 and 1947 on the calendar year and cash basis, and paid its income tax for those years to the Collector of Internal Revenue for the District of North Carolina.

On November 11, 1947 plaintiff likewise filed with the Collector for the District of North Carolina an amended income tax return for such calendar year, claiming a deduction on account of "A loss for securities vested" in the Attorney General, by it under the vesting agreement, setting out therein amounts from which it contended the loss would be known. Timely claims for refund for the taxes paid for 1945 and 1946 were filed in due season and subsequently plaintiff was notified by registered mail of the disallowance in full of said claims for refund.

The plaintiff's taxable net income for the calendar year 1945 computed without the deduction of any net operating loss carryback from the calendar year 1947, was not more than $1,469,049.25, and its normal tax net income for such year was not more than $220,039.49.

The plaintiff's taxable net income for the calendar year 1946 computed without the deduction of any net operating loss carryback from the calendar year 1947 was not more than $1,520,846.89, and its normal tax net income for such year was not more than $246,802.37.

For the calendar year 1947, if no loss was deductible by reason of the taking by the United States Government, acting through the Attorney General of the United States, of the stocks described herein, the net income of the plaintiff would have been not more than $1,307,981.78.

Based on the foregoing facts certain contentions were made by the parties to this suit. Plaintiff, taxpayer, claims a deductible loss for 1947 under Sec. 23(f) of the Internal Revenue Code, 26 U.S.C.A. § 23(f), arising from and on

account of the vesting in that year of stocks owned by it in North American Rayon Corporation and American Bemberg Corporation, by the office of Alien Property, and having a value of $16,800,-000, and its right to carry back the resulting net operating loss for 1947 against income for 1945 and 1946, claiming such loss on account of such seizure and not compensated by insurance or otherwise.

Obviously other contentions are made but the above states the basic factors.

The defendant contends that such losses as claimed are not allowable for reason's of public policy and should be denied for the reason that its allowance would tend to frustrate sharply defined national or state policies wherein particular types of conduct are prescribed,—in that to permit the taxpayer, plaintiff herein, to mitigate the effect of the seizure of its assets by the United States as a war measure under the Trading with the Enemy Act, would actually frustrate sharply defined national policies underlying the Act and would hamper its effective enforcement. The defendant further contends that the claimed loss is not allowable under Sec. 232(a), Internal Revenue Code, 26 U.S. C.A. § 232(a), for that foreign corporations doing business in this country are allowed deductions only to the extent that they are connected with income from sources from within this country.

This case apparently is one of first impression. I have had the benefit of very able briefs and have given careful study to them. To reconcile all of the cases cited therein would be well nigh an impossible factor. To interpret their meaning into the facts of this case would likewise be a useless sort of thing.

The facts in this case warrant the three following issues:

1. Did plaintiff, as taxpayer, sustain a deductible loss as a result of the vesting of the property herein under the provision of Section 23(f), Internal Revenue Code?

2. Was the loss claimed by plaintiff sufficiently connected with income from sources within the United States so as to be deductible in the year 1947 in view of the provision of Section 232(a) Internal Revenue Code?

3. If such loss is a proper deduction for 1947, is the taxpayer entitled to carry back such loss as an operating loss from 1947 to 1945 and 1946 under Section 122(b) (1) (a) Internal Revenue Code, 26 U.S. C.A. § 122(b) (1) (a)?

Since the chief defense as relied upon by the government has to do with a sharply defined national policy as set out and since the claim for reimbursement was disallowed by the defendant on the ground that "The allowance of deduction on account of such vesting would be against public policy, because it would mitigate, (in effect, reimburse in part) the exaction." I have carefully read the cases cited as bearing upon such position.

Clarke v. Haberle Crystal Springs Brewing Co., 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498, has to do with the disallowance to a taxpayer on a claimed deduction for "obsolescence" of the *good will* of its brewery business, which admittedly was destroyed by the enactment of prohibition legislation under the 18th Amendment. See also Renzichausen v. Lucas, 280 U.S. 387, 50 S.Ct. 156, 74 L.Ed. 501. Shortly following these two decisions, the question was presented to the Supreme Court in substance as to whether brewing companies were entitled under the same statute to an allowance for obsolescence of its buildings and physical equipment resulting from the taking effect of the Volstead Act under the Constitution. The court very emphatically pointed out that tangible property is different from good will (intangible property) in determining the question of obsolescence, etc. Gambrinus Brewery Co. v. Anderson, 282 U.S. 638, 51 S.Ct. 260, 75 L.Ed. 588; Burnet v. National Industrial Alcohol

Co., 282 U.S. 646, 51 S.Ct. 265, 75 L.Ed. 592; Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 51 S.Ct. 262, 75 L.Ed. 594.

Lobbying expenses paid by an agent to secure legislation was next passed upon in the case of Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249. Attorney fees and legal expense in resisting the issuance by the Postmaster General of a fraud order which would have destroyed his business. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171. And lastly a long list of cases cited, including Commissioner of Internal Revenue v. Longhorn Portland Cement Co., 5 Cir., 148 F.2d 276, in which certiorari was denied, 326 U.S. 728, 66 S.Ct. 33, 90 L.Ed. 432. Universal Atlas Cement Co. v. Commissioner, 9 T.C. 971; Id., 2 Cir., 171 F.2d 294, certiorari denied 336 U.S. 962, 69 S.Ct. 892, 93 L.Ed. 1114, and other cases of like import.

In view of the findings of fact, the contentions and the arguments above, I make the following Conclusions of Law:

That this court has jurisdiction to hear and to determine this controversy, pursuant to 28 U.S.C. § 1346(a) (1).

■ The legislative policy of the United States seems to have been consistent and definite in its desire to protect as far as is possible the property rights of citizens, friendly aliens such as was the plaintiff, and those who were classified as technical enemies in order to further its position incident to war. A careful study indicates that there was no clearly established national policy evidenced in 1947 in Congressional legislation, that the assets of a Dutch corporation placed as was the plaintiff, should be confiscated as a war measure. In fact, I am not made aware of any such Congressional policy as having yet been adopted.

That the plaintiff, taxpayer, has successfully carried the burden of proof placed upon it in this case.

■ That it sustained a deductible loss in the year 1947 as a result of the agreement which vested its property in the Attorney General. That its loss claimed is sufficiently connected with income from sources within the United States so as to be deductible in the year 1947; and that through such loss the plaintiff is entitled to carry back such as an operating loss from 1947 to 1945 and 1946, under the applicable sections of Internal Revenue Code.

That in line therewith the plaintiff is entitled to recover of the defendant $198,060.56 with interest as claimed for the years 1945 and 1946.

Counsel will prepare judgment.

Memorandum of Agreement.

Memorandum of Agreement between the Algemeene Kunstzijde Unie, N. V., a company organized under the laws of The Netherlands, represented by Pieter Wilhelmus Kamphuisen, and the Attorney General of the United States of America, represented by David L. Bazelon, Assistant Attorney General, Director, Office of Alien Property.

The Algemeene Kunstzijde Unie, N. V., hereinafter referred to as AKU, directly or indirectly owns certain property in the United States. It has been asserted, on behalf of the Alien Property Custodian of the United States and his successor, the Attorney General of the United States, that such property was and is subject to vesting. Objections to such vesting action has been expressed by the Netherlands Government and AKU, on the grounds, among others, that AKU is not and has not been at any time a German-owned or German-controlled enterprise, and that its assets in the United States are not and were not German-controlled. The United States officials have been disposed to avoid so far as possible injury to legitimate non-enemy interests in AKU, and, at the request of the Netherlands Government, have deferred vesting action pending negotiations for a settlement

based upon the extent of the enemy and non-enemy interests in AKU.

Reference is made to a letter dated July 7, 1947, from David L. Bazelon, Assistant Attorney General, Director, Office of Alien Property, for the Attorney General, addressed to the Secretary of State, and transmitted by the Secretary of State to the Netherlands Ambassador by note dated July 16, 1947. In that letter a proposal for settlement was made, providing in substance that the Attorney General should acquire by vesting or otherwise all interests in AKU and its affiliates, in North American Rayon Corporation and in American Bemberg Corporation (including certain dividends payable or paid thereon), and should authorize and facilitate release of the interests of AKU and its affiliates in other property in the United States. The letter recited in such detail as was possible on the basis of information then in the possession of the Attorney General an inventory of the property which would be acquired by the Attorney General. This proposal was accepted in principle in a note dated July 25, 1947 from the Netherlands Ambassador to the Secretary of State. Further meetings have been held for the purpose of identifying with more certainty the property involved, establishing mechanics for carrying out the settlement and recording in a joint memorandum the details of the accord thus reached.

At the same time that this Memorandum of Agreement was entered into, assurances were exchanged between the Netherlands Government and the United States Government. These assurances are set forth in a letter dated August 9, 1947, from David L. Bazelon, Assistant Attorney General, Director, Office of Alien Property, for the Attorney General, to the Secretary of State, with a request that its contents be transmitted to the Netherlands Government. It is contemplated that this letter will be confirmed by the Netherlands Government and this Memorandum of Agreement is entered into subject to such confirmation.

Exhibits A and B attached hereto list all property in the United States of any kind whatsoever owned by AKU or its affiliates and are based upon the most detailed information now available to the Netherlands Government, AKU, and the Attorney General. For the purposes of this Memorandum Agreement, the term "affiliates" shall mean only Vereinigte Glanzstoff Fabriken, A. G. and J. P. Bemberg, A. G., both companies organized under the laws of Germany.

In the light of the satisfactory resolution of the problems relating to the properties directly and indirectly held by AKU in the United States, the Attorney General does not intend to vest the property listed in Exhibit A and has agreed that such property may be released from controls exercised pursuant to the Trading with the Enemy Act. The Attorney General has so notified the Secretary of the Treasury and has obtained assurance that all necessary action will be taken to remove any restrictions which might prevent certification of the property so listed in order that such property may be certified pursuant to General License No. 95, as amended. It is contemplated that such certification will take place immediately after confirmation of the assurances exchanged between the United States Government and the Netherlands Government referred to above.

Exhibit B lists, according to the most detailed information available at this time to the Netherlands Government and AKU and the Attorney General, all interests of AKU and its affiliates in North American Rayon Corporation and American Bemberg Corporation, together with certain bank accounts. The Attorney General has issued or is issuing herewith a vesting order or orders vesting in himself all the property listed in Exhibit B.

1. AKU represents that it or its affiliates do not own any property in the United States other than that listed in Exhibits A and B.

2. AKU represents that it or its affiliates, directly or indirectly, owns all of the property listed in Exhibit B.

3. It is understood that the Attorney General will vest the property listed in Exhibit B. AKU will not assert or permit to be asserted on its behalf or on behalf of any of its affiliates any claim with respect to or arising out of the acquisition by the Attorney General of the property described in Exhibit B.

4. If any claim is asserted against the United States by any claimant whatsoever based upon ownership before vesting of any part of the aforementioned property or any interest therein, AKU shall obtain the withdrawal of such claim or shall satisfy such claim or shall pay or deliver to the Attorney General an amount of property or the value thereof, equivalent to any money or property which the United States shall have been required by a final judicial decree to pay or deliver in satisfaction of such claim; *provided, however,* that this cause shall not apply to any such claim if successfully maintained by an affiliate of AKU or a stockholder of AKU by virtue of change in existing United States law.

5. If by change in existing United States law German owned or controlled enterprises generally become entitled to a return of vested property or its proceeds, a claim may be asserted pursuant to such amendment on behalf of AKU or its affiliates notwithstanding the provisions of paragraphs 3 and 4.

6. AKU shall also obtain the withdrawal of any claim based upon any debt or obligation of AKU or any of its affiliates which may be asserted against the United States or shall pay such claim or shall pay to the Attorney General the amount of any such claim which he may be required by law to pay as a result of his acquisition of the aforementioned property. AKU shall be given notice of any such claim and shall be afforded an opportunity to present evidence with respect thereto prior to allowance thereof.

7. The Attorney General will pay, in accordance with Section 36 of the Trading with the Enemy Act, all taxes for the current taxable year which have not hitherto been paid or any subsequent year, attributable to income received by the Attorney General from the property listed in Exhibit B or attributable to the income paid into the bank accounts included in Exhibit B and all taxes for taxable years after the current taxable year levied upon property listed in Exhibit B. AKU, however, will pay all taxes for the current taxable year levied upon the property listed in Exhibit B.

8. AKU shall take or cause to be taken such action as is within its power in order that the Attorney General shall obtain delivery without cost to him or American certificates representing all shares of stock listed in Exhibit B. AKU shall take such action as is within its power to effectuate in all other ways the terms and spirit of this settlement.

9. The Attorney General will take such action as he appropriately may to facilitate the effectuation of the terms and spirit of this settlement.

10. This settlement has been made in reliance on the inventory of the property in the United States of AKU and its affiliates set forth in Exhibits A and B. In the event that it should later appear that these lists are in any respect inaccurate in their identification of the interests they purport to list, it is the intent of the parties that appropriate amendment of the lists by substitutions of equivalent value shall be made. For example, and without limitation, if it should appear that interests described as represented by American certificates are in fact represented by Netherlands certificates, the Netherlands certificates shall be substituted for the American certificates, and if it should appear that interests described as represented by outstanding shares of stock are in fact represented by the proceeds of redemption of such shares of stock, such proceeds shall be substituted for the shares of stock listed.

The Attorney General reserves all his rights with respect to any property not listed in either Exhibit A or Exhibit B and with respect to any property (including interests in North American Rayon Corporation, American Bemberg Corporation and American Enka Corporation, and including any bank accounts) owned by any person other than AKU and its affiliates.

Triplicate originals of this Memorandum were executed at Washington, D. C., on August 9, 1947, one being retained by each of the parties and one being delivered to the Netherlands Government.