### UNITED STATES of America, Appellant,

v.

### ALGEMENE KUNSTZIJDE UNIE, N. V., a corporation organized under the laws of the Netherlands, Appellee.

### No. 7002.

United States Court of Appeals Fourth Circuit.

Argued June 16, 1955.

Decided Sept. 19, 1955.

Marvin E. Frankel, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen.,

Ellis N. Slack, Hilbert P. Zarkey and Joseph F. Goetten, Sp. Assts. to Atty. Gen., and James M. Baley, Jr., U. S. Atty., Asheville, N. C., on the brief), for appellant.

George E. Cleary, New York City (Gaylord Davis, Enka, N. C., and Bernard & Parker, Asheville, N. C., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal by the United States from an adverse judgment in an action by a corporation of the Netherlands, to recover income taxes theretofore paid by it for the years 1945 and 1946 in the total sum of $198,060.56 with interest. Taxpayer bases its right of action on the fact that in 1947 certain of its property was vested in the Attorney General of the United States in settlement of a controversy arising under the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq. It contends that under this *settlement it sustained a loss sufficient*, not only to offset all income for the year 1947, but also, under applicable "carry back" provisions of the income tax laws, to offset all income for the years 1945 and 1946, so that it is entitled to recover back the income taxes paid for those years. The judge below was of opinion that taxpayer was a friendly alien and that there was no national policy justifying the vesting of its property in the Attorney General and on this ground held taxpayer entitled to the deductions claimed. 126 F.Supp. 916.

The facts are that taxpayer is a textile manufacturing corporation, organized under the laws of the Netherlands prior to the second world war and engaged in business in that country and also in the United States and Germany. Prior to the invasion of the Netherlands by Germany on May 10, 1940, about 30% of its stock was owned by nationals of Germany. After the invasion more than 50% was so owned. Its priority stock which was entitled to nominate directors

was about equally divided between nationals of the Netherlands and nationals of Germany. On May 24, 1940, the Netherlands government in exile issued a decree purporting to take into possession, for purposes of protective custody, stocks outside the kingdom of the Netherlands owned by nationals of that government. On October 20, 1944, it issued another decree confiscating all shares in Netherlands corporations owned by German nationals, but not until 1951 did it actually get possession of most of the shares of taxpayer which had been located in Germany.

As early as 1944, the United States Alien Property Custodian was prepared to enter a vesting order with respect to all the assets of taxpayer located in the United States, but postponed action in compliance with a request of the Netherlands government submitted to the Department of State. Negotiations followed in which representatives of the United States Office of Alien Property took the position that property of taxpayer in the United States was subject to vesting under the Trading with the Enemy Act, as amended, because taxpayer had been controlled by German nationals and a substantial part of its stock was owned by them and because it was in the interest of the United States that taxpayer be classified as an enemy national. Taxpayer claimed that it had not been controlled by German nationals, that they owned only a minority of its stock and that it was improper to classify it as an enemy national. The situation was complicated by the fact that, whereas the property to be vested was situated in this country, control over the corporation and its shares of stock was in the Netherlands government.

An agreement was finally reached on August 9, 1947 between the Attorney General of the United States, acting as Alien Property Custodian, and the taxpayer, which was approved by the governments of both the Netherlands and the United States. Under this agreement, certain property of taxpayer in this country, estimated as being 30% thereof and corresponding roughly with the proportion of German ownership in the corporation, was to be vested in the Attorney General under the Trading with the Enemy Act and the remaining property of the corporation was to be released from all claims on the part of the United States. By a prior agreement between the Netherlands government and taxpayer, the former was to secure and turn over to the latter sufficient of the shares in the corporation owned by German nationals to compensate taxpayer for the property so vested in the Attorney General. Under the agreement between taxpayer and the Attorney General, stocks of the North American Rayon Corporation and the American Bemberg Corporation belonging to taxpayer were vested in the Attorney General, and its holdings of stock in the American Enka Corporation were released from all claims on his part. A vesting order was entered on August 9, 1947, in accordance with the agreement. The stock of taxpayer thus vested in the Attorney General had been held by it for more than six months and had a tax basis to taxpayer of not less than $16,800,000. The Netherlands government did not turn over stock to taxpayer of sufficient value to compensate for the stocks vested in the Attorney General, but did make payments aggregating $6,263,610.

By paragraph 3 of the agreement it was provided that taxpayer would not assert or permit to be asserted on its behalf or on behalf of any of its affiliates any claim with respect to or arising out of the acquisition by the Attorney General of the property described in Exhibit B (the property vested). Provision was made by paragraph 5, however, for the assertion of a claim by taxpayer on account of the property vested, if by change in the law of the United States German owned or controlled enterprises should become entitled to return of vested property. That paragraph provided "If by change in existing

United States law German owned or controlled enterprises generally become entitled to a return of vested property or its proceeds, a claim may be asserted pursuant to such amendment on behalf of AKU [the taxpayer] or its affiliates notwithstanding the provisions of paragraphs 3 and 4".

■ On these facts, we think it clear that taxpayer was not entitled to claim as a deductible loss the value of the property vested in the Attorney General. Even though taxpayer was created under the laws of a friendly power and is to be treated as a friendly alien, there can be no question but that it was proper to pierce the corporate veil and seize the portion of the property properly attributable to ownership by alien enemies, thus freeing the remainder of its property from "enemy taint". Kaufman v. Societe Internationale, 343 U.S. 156, 159, 72 S.Ct. 611, 96 L.Ed. 853; Uebersee Finanz-Korporation, A. G. v. McGrath, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888. As said in the case of Kaufman v. Societe Internationale, supra [343 U.S. 156, 72 S.Ct. 613]:

"Under the 1941 amendment the nonenemy character of a foreign corporation because it was organized in a friendly or neutral nation no longer conclusively determines that all interests in the corporation must be treated as friendly or neutral. The corporate veil can now be pierced. Enemy taint can be found if there are enemy officers or stockholders; even the presence of some nonenemy stockholders does not prevent seizure of all the corporate assets. But such a governmental seizure requires consideration of the plight of innocent stockholders. For as stated in the Uebersee case, the amendment does not contemplate appropriation of friendly or neutral assets. While Congress has clearly provided for forfeiture of enemy assets, it has used no language requiring us to hold that innocent interests must be confiscated because of the guilt of other stockholders."

■ The agreement between the Attorney General and taxpayer, although prior to these decisions, was in accord with the principles therein laid down. What it did was to sever the enemy owned interest in the corporate property from that owned by friendly aliens, to subject the former to vesting under the Trading with the Enemy Act and to release the latter from all claims under that act. Whatever might have been the situation if the vesting order had been entered in the absence of such an agreement, there can be no question but that, upon the entry of the agreement, the property was properly vested as enemy owned property; and, having voluntarily entered into such agreement, taxpayer may not be heard to assert the contrary. Cf. Com'r of Internal Revenue v. Longhorn Portland Cement Co., 5 Cir., 148 F.2d 276, certiorari denied 326 U.S. 728, 66 S.Ct. 33, 90 L.Ed. 432; Universal Atlas Cement Co. v. Com'r, 9 T.C. 971, affirmed 2 Cir., 171 F.2d 294, certiorari denied 336 U.S. 962, 69 S.Ct. 892, 93 L.Ed. 1114; Standard Oil Co. v. Com'r, 7 Cir., 129 F.2d 363, certiorari denied 317 U.S. 688, 63 S.Ct. 261, 87 L.Ed. 551, rehearing denied 319 U.S. 784, 63 S.Ct. 1323, 87 L.Ed. 1727.

We may put to one side, therefore, all arguments based upon the hypothesis that the property here vested was not enemy owned, and come to the real question in the case, i. e. may a foreign corporation doing business in the United States claim as a deductible loss from its income, the value of a portion of its property vested in the Attorney General under the Trading with the Enemy Act. We think it clear that this question must be answered in the negative. While section 23(f) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(f) provides for deduction of losses sustained by corporations, section 232 provides that "In the case of a foreign corporation the deductions shall be allowed only if and to the

extent that they are connected with income from sources within the United States * * *." 26 U.S.C.A. § 232. There is grave question whether the severance of enemy interest in a corporation and the vesting of such interest under the statute is a loss to the corporation. It is not a loss to the corporation, if the corporate fiction be ignored, but a loss to the enemy owner of the stock, just as though the interest of an alien enemy in partnership property had been seized under the act. And it was to permit the seizure of the enemy owned interest without affecting the interest of friends that the agreements were entered into between taxpayer and the Attorney General and taxpayer and the Netherlands government.[1]

There is an even graver question as to whether it was a "loss connected with income from sources within the United States." On the part of the Government it is said that the loss was connected not with income from any source but with stock ownership; and it is pointed out that the loss arose not in connection with the earning of income, but because of the German war of aggression and the ownership of stock by German nationals. In support of this conclusion, I.T. 2792, XIII–1 C.B. 85, as cited in Corporacion de Ventas de Salitre y Yoda de Chile, 44 B.T.A. 393, 407, is quoted as follows:

"* * * To be allowable therefore the deduction must be 'connected' with income from sources within the United States. The word 'connected' means 'joined or linked together by some tie, as of causality, relationship, or intimacy.' The meaning at once suggested is that the requisite tie between the deduction and the income is that of causality, that is, that the expenditure for which the deduction is claimed must enter into, and be directly re-

lated to, the production of the income."

The taxpayer, on the other hand, contends that the occurrence rather than the cause of the loss is the controlling circumstance; and that, since the taxpayer lost assets worth seventeen millions, which were located and produced income in the United States, the required connection between the loss and the income is established, and hence the loss is deductible in the same way as the loss on the sale of assets of a foreign corporation which produced income in this country was held to be deductible in Royal Ins. Co., 38 B.T.A. 955, and Stockholms Enskilda Bank, 40 B.T.A. 107.

■ We need not decide either of these questions, however, since we are of opinion that the vesting of property under the trading with the enemy act was not a loss within the purpose and meaning of the statute allowing deductions for losses and that to allow a deduction on that account would be contrary to the well established public policy of the country. It would be nothing short of absurd to allow the holder of enemy property which has been taken over by the government under the trading with the enemy act to recover back a part of it under the guise of a tax deduction, —no less absurd than to allow a tax deduction on account of a fine or a forfeiture. As said by Judge Learned Hand with respect to penalties in Jerry Rossman Corp. v. Com'r, 2 Cir., 175 F.2d 711, 713:

"The Revenue Act does not declare that penalties may not be deducted; the doctrine is a judicial gloss—and, for that matter, a gloss of the lower courts only, save as the Supreme Court recognized it by implication in Com'r [of Internal Revenue] v. Heininger [320 U.S.

___

1. If friendly stockholders have sustained a loss, as argued, it is not because of the vesting order entered in accordance with agreements which thoroughly protected their interest in the corporation, but as a result of the failure of the Netherlands government to surrender, in accordance with its agreement, stock formerly owned by Germans in an amount sufficient to compensate the corporation for the value of the property vested.

467, 64 S.Ct. 249, 88 L.Ed. 171]. We agree that it is a proper gloss (indeed we have ourselves enforced it several times); and its justification is that, when acts are condemned by law and their commission is made punishable by fines or forfeitures, to allow these to be deducted from the wrongdoer's gross income, reduces, and so in part defeats, the prescribed punishment. Obviously, to relieve the wrongdoer of a part of the tax due upon his income, in effect is to remit that much of the sanction imposed; as would at once be apparent, if we were to compare the case of a wrongdoer who has an income with that of one who has none."

See also Lilly v. Com'r, 343 U.S. 90, 97, 72 S.Ct. 497, 96 L.Ed. 769; Com'r of Internal Revenue v. Heininger, 320 U.S. 467, 474, 64 S.Ct. 249, 88 L.Ed. 171; Textile Mills Securities Corp. v. Com'r, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249; Clarke v. Haberle Crystal Springs Brewing Co., 280 U.S. 384, 50 S.Ct. 155, 74 L.Ed. 498; Standard Oil Co. v. Com'r, supra, 7 Cir., 129 F.2d 363, certiorari denied 317 U.S. 688, 63 S.Ct. 261, 87 L.Ed. 551, rehearing denied 319 U.S. 784, 63 S.Ct. 1323, 87 L.Ed. 1727.

It is argued that there was no established policy looking to the confiscation of enemy owned property at the time of the vesting order and that not until the passage of the act of July 3, 1948, 62 Stat. 1246, 50 U.S.C.A. Appendix, § 39, did Congress pass a statute providing that the property of German nationals should not be returned. This, however, overlooks the fact that the act of 1948 was passed pursuant to the Paris Reparations Agreement of January 14, 1946, 61 Stat. 3157, to which the United States was a party, which provided that each signatory government shall "hold or dispose of German enemy assets within its jurisdiction in manners designed to preclude their return to German ownership or control". 61 Stat. 3168. At all events, it is perfectly clear that the Trading with the Enemy Act provided for the seizure of enemy owned property, and return thereof is provided for only to a person who is "not an enemy or ally of enemy". As the agreement here admitted the enemy ownership of the property vested, there could have been no return thereof under the law existing at that time. The agreement recognized this and made provision for return in the event of a change of law. The act of 1948 did not change but merely confirmed the public policy evidenced by existing law. At the time of the agreement there existed nothing more than a hope that the property of German nationals which had been seized under the Trading with the Enemy Act might be returned at least in part as had been done by the War Claims Act of 1928, 45 Stat. 254; but this was a mere hope which was largely extinguished by the passage of the Act of 1948. That it was nothing more than a hope sufficiently appears from the language of the agreement itself, providing that a claim might be asserted only if *"by change in existing United States law"*, German owned or controlled enterprises might become entitled to a return of vested property.

It is argued that paragraph 3 of the agreement precludes the assertion of a tax deduction with respect to the vested property since the assertion of such a loss amounts to the assertion of a claim against the United States on which taxpayer in this action is seeking recovery of a large sum of money. In the view that we take of the case, it is not necessary that we go into this question. If the paragraph relied on did not preclude the assertion of a claim such as this, it certainly did preclude assertion that the property was not properly vested as enemy owned under the Trading with the Enemy Act; and that is sufficient to put an end to taxpayer's claim for a tax deduction.

For the reasons stated, the judgment appealed from will be reversed and the case will be remanded with direction to enter judgment for the United States.

Reversed.