LUTHER M. RICHEY, JR., AND WYONA B. RICHEY, PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73282.   Filed November 17, 1959.

*John M. Schofield, Esq.*, for the petitioners.
*James E. Johnson, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in income tax against petitioners for the taxable year 1955 in the amount of $4,084.21.

The principal issue is whether petitioner, who actively participated in a scheme to duplicate United States currency, and in connection therewith was swindled out of $15,000, is entitled to a deduction of that amount under section 165(c)(2) or (3) of the Code of 1954, or whether such deduction should be disallowed as constituting a frustration of sharply defined public policy.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

Petitioners, Luther M. Richey, Jr., and Wyona B. Richey, were married and residents of Seneca, South Carolina, during the taxable year 1955. They filed a joint individual income tax return (Form 1040) for the taxable year 1955 with the district director of internal revenue for the district of South Carolina. Their return for the year 1955 disclosed a deduction in the amount of $15,000, which was listed as "Theft $15,000—Theft is currently being investigated by the Federal Bureau of Investigation."

Luther M. Richey, Jr. (hereinafter referred to as petitioner), operated a highway construction business known as Richey Construction Company during the year 1955. In addition, he was always interested in "making a dollar" in other enterprises. Petitioner is a high school graduate. At the time of the hearing of this case he had been getting direct highway construction contracts for 7 years.

Petitioner was contacted by Bill Randall and was asked if he was interested in making some money. At the time Randall contacted him, petitioner was familiar with the fact that Randall had

served time in the Federal penitentiary in Atlanta. As a result of his conversation with Randall, petitioner accompanied Randall to the Clemson House Hotel in Clemson, South Carolina, where they met an R. L. or C. L. Johnson.

At his room in the Clemson House, Johnson went through a process which convinced petitioner that he could duplicate money. Johnson's process involved bleaching out $1 bills and transferring the excess ink from $100 bills onto the bleached-out bills. After watching him demonstrate his duplication process, petitioner was convinced that Johnson could reproduce money and that he could make some easy money by investing in the venture.

Petitioner was told not to discuss the deal with anyone. Petitioner withdrew the sums of $10,000 and $5,000 from the account of Richey Construction Company in the Oconee County Bank, Seneca, South Carolina, on August 25 and August 26, 1955, respectively. Petitioner then went with Bill Randall to the Federal Reserve bank in Atlanta, Georgia, where they exchanged the money from tens and twenties into $100 bills. Petitioner and Randall thereupon drove to the Patten Hotel in Chattanooga, Tennessee, where they were to meet Johnson for the duplicating process.

Petitioner and Randall registered at the Patten Hotel. Petitioner went with Johnson to his hotel room with knowledge that Johnson was expected to use his $100 bills to duplicate other $100 bills and turned his $15,000 over to Johnson for that purpose. Johnson told petitioner that he would receive $45,000 as a return on his $15,000 investment, and that this would be in the form of his original $15,000 plus $30,000 more which would consist of good money which Johnson would get from the bank and turn over to him. After petitioner turned his $15,000 over to Johnson at the Patten Hotel, Johnson and petitioner began the process of raising the bills. Petitioner washed the bills and otherwise actively participated in the process. Before the process was completed, Johnson left the room under the pretext of going to get something and never returned.

The following day petitioner discovered that the $15,000 he had given to Johnson was missing. After petitioner returned home, he became convinced that Randall was in on the deal. He approached Randall and asked for the return of his money. Randall told petitioner that he would get his money back.

Later, petitioner employed an attorney at law in Walhalla, South Carolina, to recover his money. The attorney, on behalf of petitioner, contacted Bill Randall, who asked if petitioner would be satisfied with $10,000 in settlement. Randall's offer was rejected by the attorney since petitioner had informed him that he wanted the full $15,000 in settlement. Petitioner has never instituted a

civil action or brought any proceedings in court to recover his money.

Petitioner invested $15,000 in a transaction which included in its objective reproduction or duplication of United States currency intending to profit illegally therefrom.

## OPINION.

Petitioner, the sole witness in this proceeding, asserts that he put up $15,000 as part of a scheme whose aim was to forge or duplicate United States $100 bills. He contends, however, that his search for a second income was barren of any criminal or other wrongful intent and merely reflected an innocent plan to make a dollar. This we simply do not believe. Our observation of the witness and analysis of his testimony convince us that he understood fully the nature of the scheme, and that he willingly joined with Johnson and Randall at least in starting the process of duplication. The original scheme, in which all three joined and in part implemented, was to duplicate currency. That petitioner's cohorts, or either of them, may have found it more profitable and expeditious to change the plan into a swindle of petitioner does not alter the picture of the nature of the unlawful scheme on which petitioner had embarked. We may add that the general scheme does not appear to be a novel one. See *Foster* v. *United States*, 76 F. 2d 183 (C.A. 10, 1935), a criminal case involving a remarkably similar scheme wherein the principals not only altered bills (by the scratch method) but used them in an effort to defraud and swindle a prospective coconspirator. In the instant case, petitioner, claiming to be the victim, actually participated in the illegal alterations up to the time that Johnson decamped with his money.

We have found the facts substantially in accordance with petitioner's testimony except his declarations of his own innocence and lack of wrongful intent. Respondent's own requested findings are substantially to the same effect.

Accepting these facts, it would appear that petitioner has brought himself within the literal requirements of sections · 165(a) and 165(c) (2) or (3).[1]

---

[1] SEC. 165. LOSSES.

    (a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

    \*       \*       \*       \*       \*       \*       \*

    (c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    \*       \*       \*       \*       \*       \*       \*

    (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

    (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return.

The significant question as yet unanswered, however, is whether allowance of the claimed deduction would frustrate public policy under all of the facts.

Most of the cases dealing with the problem of whether a deduction may be denied for reasons of public policy have arisen in the area of business expense deductions which are sought to be classified as "ordinary and necessary." In one such case, *Jerry Rossman Corporation* v. *Commissioner*, 175 F. 2d 711 (C.A. 2, 1949), Judge Learned Hand set forth some of the public policy reasons for disallowing certain penalty payments as expense deductions as follows (p. 713):

The Revenue Act does not declare that penalties may not be deducted; the doctrine is a judicial gloss—and, for that matter, a gloss of the lower courts only, save as the Supreme Court recognized it by implication in *Commissioner* v. *Heininger*. We agree that it is a proper gloss (indeed we have ourselves enforced it several times); and its justification is that, when acts are condemned by law and their commission is made punishable by fines or forfeitures, to allow these to be deducted from the wrongdoer's gross income, reduces, and so in part defeats, the prescribed punishment. Obviously, to relieve the wrongdoer of a part of the tax due upon his income, in effect is to remit that much of the sanction imposed; as would at once be apparent, if we were to compare the case of a wrongdoer who has an income with that of one who has none. * * *

See also *William F. Davis, Jr.*, 17 T.C. 549.

In the expense deduction field, the Supreme Court has recently recognized the validity of the principle that an expense may be disallowed if its allowance would contravene sharply defined Federal or State policy. See *Tank Truck Rentals, Inc.* v. *Commissioner*, 356 U.S. 30 (1958), and *Commissioner* v. *Sullivan*, 356 U.S. 27 (1958). Neither of these cases is controlling here, however, because of factual differences, recognized in *United States* v. *Winters*, 261 F. 2d 675 (C.A. 10, 1958), certiorari denied 359 U.S. 943, in which the Court of Appeals said (p. 679):

While the decision in this case is not controlled by Tank Truck Rentals, supra, where the claimed deductions represented fines paid for law violations, it also is not controlled by Sullivan, supra, where deductions for rent and expenses incurred in the conduct of an illegal business were allowed. In Sullivan the court pointed out that the treasury regulations permitted the deduction of the federal excise tax on wagers and that such policy "seems sufficiently hospitable to allow the normal deductions of the rent and wages" necessary to conduct the business. No such hospitality is shown in the instant case as federal law forbids the importation of the liquor into Oklahoma and a pertinent Internal Revenue ruling forbids the deduction.

In *United States* v. *Winters*, *supra*, where the principles emerging from the facts are similar to those presented in the instant case, but where the policy frustrated was, we think, less sharply defined than here, the court reached the following conclusion (p. 680):

This is not a case of a taxpayer becoming innocently involved in an illegal transaction. Rather it is one where a taxpayer deliberately and knowingly patronized an illegal business. By reason of such patronage there was a severe and immediate frustration of state policy. This requires disallowance of the claimed deduction.

The principles which support denial of deductions where allowance would frustrate sharply defined public policy have been applied to claimed losses as well as expenses. *Lawrence A. Wagner*, 30 B.T.A. 1099 (1934); *Fuller* v. *Commissioner*, 213 F. 2d 102 (C.A. 10, 1954) affirming *G. E. Fuller*, 20 T.C. 308, 317 (1953); *United States* v. *Algemene Kunstzijde Unie, N. V.*, 226 F. 2d 115 (C.A. 4, 1955); *William F. Davis, Jr., supra.*

The decision in each case as to whether allowance of a deduction would frustrate a strictly defined public policy must rest on the particular fact situation. Practical application of the test was set forth by the Supreme Court in *Tank Truck Rentals, Inc., supra,* in the following language (p. 35):

Although each case must turn on its own facts, * * * the test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction. The flexibility of such a standard is necessary if we are to accommodate both the congressional intent to tax only net income, and the presumption against congressional intent to encourage violation of declared public policy.

With this background of the law, the test, and its practical application, we turn to the specific problem here presented.

The Federal statutes provide criminal penalties for those who counterfeit, alter, or make United States money.[2] This provision clearly establishes a firm public policy to prevent the type of conduct engaged in by petitioner and to punish such acts if and when they occur.

The record establishes that petitioner's conduct constituted an attempt to counterfeit, an actual start in the counterfeiting activity, and overt acts looking to consummation of the counterfeiting scheme. Petitioner actively participated in the venture. He withdrew money from the bank and changed it into high denomination bills with the full knowledge and intention that the money would be used to duplicate other bills. He was physically present at the place of alteration, and assisted in the process by washing the bills and otherwise aiding Randall and Johnson in their chores. He was part and parcel of the attempt to duplicate the money. Petitioner's actions are no less a violation of public policy because there was another scheme involved, namely, that of swindling the petitioner. From the facts,

---

[2] 18 U.S.C.A., sec. 471.

"Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligations or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

we hold that to allow the loss deduction in the instant case would constitute a severe and immediate frustration of the clearly defined policy against counterfeiting obligations of the United States.

In view of the conclusions expressed above, it is not necessary for us to consider respondent's alternative arguments.

In the light of the foregoing discussion, petitioner's claim for a loss deduction is disallowed.

*Decision will be entered under Rule 50.*