RAYMOND MAZZEI AND ELIZABETH D. MAZZEI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6007–70.   Filed January 23, 1974.

*Carle E. Davis* and *Rosewell Page III*, for the petitioners.
*David E. Price*, for the respondent.

QUEALY, *Judge:* Respondent determined a deficiency in income tax against petitioners for the taxable year 1965 in the amount of $7,676.86. As a result of certain concessions by the parties, the sole question presented for decision is whether the petitioners are entitled to deduct a loss in the taxable year 1965 on account of being defrauded in a scheme to reproduce United States currency. Petitioners claim the deduction under section 165(c)(2)[1] or section 165(c)(3).[2]

### FINDINGS OF FACT

Some of the facts have been stipulated, and such facts and stipulated exhibits attached thereto are incorporated herein by this reference.

Petitioners Raymond Mazzei and Elizabeth D. Mazzei are husband and wife. Their residence at the time they filed their petition herein was Hopewell, Va. Petitioners filed their joint Federal income tax return for the calendar year 1965 with the Internal Revenue Service Center in Philadelphia, Pa. As Elizabeth D. Mazzei is a party herein solely because she filed a joint income tax return with her husband, Raymond Mazzei will hereinafter be referred to as petitioner.

During the year at issue, and for some time prior thereto, petitioner operated a sheet metal company in Hopewell, Va., in partnership with

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[2] Insofar as material herein, sec. 165(c) provides as follows:

SEC. 165. LOSSES.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *

his brother. Vernon Blick was an employee of the company in 1965 and had been an employee for 4 or 5 years.

In March 1965, Blick was told by a man named Cousins of a scheme for reproducing money. Blick accompanied Cousins to a hotel in Washington, D.C., where Cousins introduced Blick to two other men named Collins and Joe. At that time, Collins and Joe showed Blick a black box which they asserted was capable of reproducing money. The black box was approximately 15 inches long, 8 or 10 inches wide, and 6 inches deep, about the size of a shoebox. It was made of metal and had a handle on it.

Blick gave Collins a $10 bill which Collins took and placed between two pieces of white paper of about the same size. Collins put the money and the paper into the box and connected the box to an electric outlet. The black box began a buzzing sound which continued for about 10 minutes. Then Collins reached into the box and pulled out Blick's $10 bill and what appeared to be a new $10 bill. Collins then told Blick that they could not reproduce any more money at that time because they did not have enough of the type of paper required. In addition, Collins indicated that they would rather not use small denomination bills, but instead they wanted larger denominations such as $100 bills. Blick then returned to Hopewell.

Blick having told Cousins about petitioner, Cousins requested Blick to have petitioner meet with Cousins. In April or May of 1965, Blick recounted the events of the demonstration to petitioner. Thereafter, petitioner and Blick went to see Cousins in Hopewell and discussed a "deal" to reproduce money with Cousins, Collins, and Joe in Washington, D.C., and New York City. Petitioner was to provide money which Cousins, Collins, and Joe would reproduce and then return to petitioner.

After his first meeting with Cousins, petitioner was contacted several times concerning further arrangements for reproducing money.

In May 1965, Cousins took petitioner and Blick to New York City. Petitioner carried $10,000 in cash with him at Cousins' request. They went to a hotel in Brooklyn where Cousins telephoned Collins and Joe who then came over with the black box. Petitioner gave Collins a $100 bill in order to demonstrate the reproduction box. Collins went through the "reproduction" process and returned to petitioner his bill and a new $100 bill. Petitioner requested that they reproduce more money, but was told that there was not enough of the right kind of paper, which was supposed to be a special type used by the Federal Government and obtained through a "friend" in Washington, D.C. Cousins then took petitioner and Blick back to Hopewell that afternoon.

Petitioner continued to inquire of Cousins about reproducing more money but again was told that the difficulty in obtaining the right kind of reproducing paper was holding things up. However, petitioner did give $700 to Cousins who supposedly went to New York and reproduced it. Cousins returned petitioner's $700 plus $300 more, supposedly reproduced. Once again, Cousins said that the reason he did not reproduce more was because of the lack of sufficient paper.

Approximately a week later, Joe telephoned petitioner from New York and stated that they would be ready in a few days to proceed with the deal. Joe requested petitioner to obtain $20,000 in large denominations, preferably $100 bills.

On June 1, 1965, petitioner cashed a check for $20,000 on his company's account at a local bank, taking the proceeds in $100 bills. Blick obtained $5,000, borrowed from petitioner's brother, also through a check on the company account. Several days later, Joe called petitioner, confirmed that petitioner had acquired the cash and requested petitioner and Blick to meet him in New York.

On June 3, 1965, petitioner and Blick flew to New York City with the money. Once in New York, petitioner and Blick went to a designated hotel to meet Cousins, Collins, and Joe. Joe came by the hotel and met petitioner, confirming that petitioner and Blick had the money. The three then went outside where Collins was waiting with a taxicab. They proceeded to an apartment in Brooklyn, stopping on the way for Collins or Joe to purchase some liquor.

Once at the apartment, petitioner and Blick were again shown the black box. Collins then asked petitioner for the money. Petitioner handed Collins a packet of money containing $5,000. Collins removed the wrapper and placed the money into a pan of water. Collins then removed the money from the water and placed each $100 bill between two pieces of white paper which he then set aside. Collins continued the process until he finished with the series of bills in the $5,000 packet. Petitioner then handed Collins another $5,000 packet, and Collins repeated the same process. This continued until petitioner had given Collins the entire $20,000. Petitioner then informed Collins that Blick had $5,000, which Blick then gave to petitioner who in turn gave it to Collins.

Collins then informed petitioner and Blick that the black box was broken and would not work. Collins told them that they would have to use an oven, apparently to complete the reproduction process. Collins then turned on an ordinary electric oven which was in the apartment and put all of the money in the oven. At this point, two armed men broke into the room impersonating law enforcement officers making a counterfeiting raid. Petitioner and Blick were held at gun-

point while one of the men placed handcuffs on Joe. The two men representing themselves to be officers then removed the money from the oven. As the two intruders proceeded to the door of the apartment, petitioner broke away and ran up the street to seek the assistance of a police officer whom he saw. Petitioner reported the incident to the police officer, who told petitioner to wait until a squad car could arrive.

Meanwhile, Blick, who had remained with Collins, Joe, and the two intruders, requested them to return the money. Blick was told he would be shot if he attempted to retrieve the money. Then Collins, Joe, and the two intruders went out of the apartment, got into a taxicab and left with the money.

Petitioner returned with the police and found Blick alone. The black box was examined and found to be nothing more than a tin box with a buzzer. It could not have reproduced any money. Petitioner and Blick accompanied the police to the police station and filed a report of the incident. The next day, petitioner and Blick returned to Hopewell and reported the incident to the police there. The incident was also discussed with the Federal Bureau of Investigation.

On his Federal income tax return for the calendar year 1965, petitioner claimed a theft loss in the amount of $20,000 and took a deduction therefor in the amount of $19,900.

In his statutory notice of deficiency, respondent disallowed the deduction for the loss under section 165(c) (2) or (3) on the grounds of lack of adequate substantiation of the loss and, further, that allowance of the deduction would be contrary to public policy.

OPINION

Petitioner contends that the fact that he incurred a loss is substantiated by the evidence and that such loss is deductible under section 165(c)(2) or section 165(c)(3). Respondent contends initially that petitioner has failed to prove that a loss was in fact suffered, and, further, that even if a loss were proven in fact, a deduction for such loss would not be allowed under section 165(c)(2) or section 165(c)(3) on the grounds that allowance of such a deduction would be contrary to public policy. As our findings of fact indicate, the Court is convinced that petitioner, in fact, incurred a loss in the sum of $20,000, as the result of being defrauded. However, the deductibility of such loss is precluded by our decision in *Luther M. Richey, Jr.*, 33 T.C. 272 (1959).

In the *Richey* case, the taxpayer became involved with two other men in a scheme to counterfeit United States currency. The taxpayer observed a reproduction process involving the bleaching out of $1 bills and the transferring of the excess ink from $100 bills onto the bleached-

out bills. Upon observing this demonstration, the taxpayer became convinced that the process could reproduce money. When the taxpayer later met with the other men in a hotel room to carry out the scheme, the taxpayer turned over to one of the other men $15,000 which was to be used in the duplication process. Before the process was completed, one of the other men to whom the taxpayer had given the $15,000 left the room under the pretext of going to get something and never returned. The taxpayer later discovered that his money was gone and was not able to recover it. We disallowed the taxpayer's claimed loss deduction under section 165(c)(2) and section 165(c)(3), on the grounds that to allow the loss deduction would constitute an immediate and severe frustration of the clearly defined policy against counterfeiting obligations of the United States as enunciated by title 18, U.S.C., sec. 471.[3] This Court said:

> The record establishes that petitioner's conduct constituted an attempt to counterfeit, an actual start in the counterfeiting activity, and overt acts looking to consummation of the counterfeiting scheme. Petitioner actively participated in the venture. He withdrew money from the bank and changed it into high denomination bills with the full knowledge and intention that the money would be used to duplicate other bills. He was physically present at the place of alteration, and assisted in the process by washing the bills and otherwise aiding Randall and Johnson in their chores. He was part and parcel of the attempt to duplicate the money. Petitioner's actions are no less a violation of public policy because there was another scheme involved, namely, that of swindling the petitioner. From the facts, we hold that to allow the loss deduction in the instant case would constitute a severe and immediate frustration of the clearly defined policy against counterfeiting obligations of the United States. [33 T.C. at 276–277.]

Petitioner would distinguish the *Richey* case on the grounds that there the taxpayer was involved in an actual scheme to duplicate money where the process was actually begun, only to have the taxpayer swindled when his cohorts made off with his money, whereas in the instant case there never was any real plan to counterfeit money, it being impossible to duplicate currency with the black box. Petitioner contends that, from the inception, the only actual illegal scheme was the scheme to relieve petitioner of his money, and petitioner was a victim and not a perpetrator of the scheme.

In our opinion, the fact that the petitioner was victimized in what he thought was a plan or conspiracy to produce counterfeit currency does not make his participation in what he considered to be a criminal act any less violative of a clearly declared public policy. Not only was the result sought by the petitioner contrary to such policy, but the

---

[3] 18 U.S.C., sec. 471:

Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

conspiracy itself constituted a violation of law.[4] The petitioner conspired with his covictim to commit a criminal act, namely, the counterfeiting of United States currency and his theft loss was directly related to that act. If there was a transaction entered into for profit, as petitioner argues, it was a conspiracy to counterfeit.[5]

While it is also recognized that the Supreme Court in *Commissioner v. Tellier*, 383 U.S. 687 (1966), may have redefined the criteria for the disallowance on grounds of public policy of an otherwise deductible business expense under section 162(a), we do not have that type of case. The loss claimed by the petitioner here had a direct relationship to the purported illegal act which the petitioner conspired to commit. Compare *Commissioner v. Heininger*, 320 U.S. 467 (1943).

We also do not feel constrained to follow *Edwards v. Bromberg*, 232 F. 2d 107 (C.A. 5, 1956), wherein the court allowed a deduction for a loss incurred by the taxpayer when money, which he thought was being bet on a "fixed" race, was stolen from him. The taxpayer never intended to participate in "fixing" the race.

The ultimate question for decision in this case is whether considerations of public policy should enter into the allowance of a theft loss under section 165(c)(3) where there is a "theft"—and the loss by the petitioner of his money would certainly qualify as such—the statute imposes no limitation on the deductibility of the loss. Neverthless, in *Luther M. Richey, Jr., supra*, this Court held that the deduction of an admitted theft was properly disallowed on grounds of public policy in a factual situation which we find indistinguishable. We would follow that case.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

DAWSON, *J.*, concurring: I agree with Judge Quealy and Judge Tannenwald. In my judgment this is neither the time nor the case to sanction a theft loss deduction where the petitioner clearly intended to conspire with others in a scheme to counterfeit United States cur-

---

[4] 18 U.S.C., sec. 371:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

[5] While *legal impossibility* may constitute a defense to a criminal prosecution, the *factual impossibility* of a completed crime may not be a defense to a criminal prosecution under a separate conspiracy or attempt statute. 16 Am. Jur. 2d, sec. 7; 15A C.J.S., sec. 44. See also Elkind, "Impossibility in Criminal Attempts: A Theorist's Headache," 54 Va. L. Rev. 20 (1968).

rency. We wisely blocked such an attempt in *Luther M. Richey, Jr.*, 33 T.C. 272 (1959), which remains a viable precedent. Nothing in *Commissioner* v. *Tellier*, 383 U.S. 687 (1966), or in any other pronouncement of the Supreme Court, points to a contrary result. In *Tellier*, the taxpayer was permitted to deduct as business expenses under section 162(a) legal fees incurred in his defense against charges of past criminal conduct. The Commissioner urged that such expenses, concededly ordinary and necessary, should have been disallowed on public policy grounds. This was rejected by the Supreme Court because income from a criminal enterprise is taxed in the same way as income from more conventional sources. Therefore, in view of the firm public policy to tax only *net* income, deductions for losses incurred in connection with a criminal business enterprise are allowed in determining "net income." The exception to this rule, which is limited in application, occurs when the allowance of a deduction frustrates clearly defined national or State policy proscribing particular types of conduct. *Tellier* fell far outside any sharply defined category since no public policy is offended when a person faced with serious criminal charges employs a lawyer to aid him in his defense.

The claimed theft loss here was connected with an intended initiation of the criminal enterprise of counterfeiting. We are not confronted with income from the criminal enterprise, but only with a loss of capital invested in the scheme to counterfeit. And we are not dealing with any gross income from the "business" of counterfeiting, nor are we faced with a claimed "business expense." This is purely and simply a situation in which the test of nondeductibility is the severity and immediacy of the frustration resulting from the allowance of the deduction. *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30, 35 (1958). There is a sharply defined national policy proscribing counterfeiting. It would be utterly senseless to frustrate this policy.

DRENNEN, *J.*, agrees with this concurring opinion.

---

TANNENWALD, *J.*, concurring: I wholeheartedly agree with the result reached by the majority. It is inconceivable to me that Congress intended that a taxpayer should be allowed to deduct a payment *voluntarily made*, which is part and parcel of the very act believed by him to constitute a crime and involving a type of conduct proscribed by sharply defined "national or state policies evidenced by some governmental declaration" (see *Commissioner* v. *Tellier*, 383 U.S. 687, 694 (1966)). To put a more extreme case, could there be any doubt that no deduction would be allowable where the taxpayer, desiring to have a particular person murdered, pays a sum of money for that

purpose to a thug who pockets the cash without intending to carry out the deed?

There is a sharp distinction between such payments, so interwoven with the purported criminal act, and payments of an inherently innocent character, like rent or utility charges, which *Commissioner* v. *Sullivan*, 356 U.S. 27 (1958), held might appropriately be taken into account in determining the taxable income of an illegal enterprise because they bore only "a remote relation to an illegal act." See 356 U.S. at 29. The fact that the particular mechanism chosen in this case would not have resulted in the successful consummation of the contemplated crime seems to me to be irrelevant—petitioner was unaware of such incapability of the mechanism.

Clearly, *Tellier* did not preclude the application of public policy considerations under any and all circumstances. Similarly, in enacting the amendments to section 162, dealing with the deduction of various items involving such considerations, Congress left the door open by recognizing that "public policy, in other circumstances, *generally* is not sufficiently clearly defined to justify the disallowance of deductions." See S. Rept. No. 91–552, 91st Cong., 1st Sess., p. 274 (1969) (emphasis added). The reference to legislative retention of control over deductions in the Senate committee report accompanying the Revenue Act of 1971 was limited to situations involving bribes and kickbacks. See S. Rept. No. 92–437, 92d Cong., 1st Sess., p. 72 (1971).

I would apply the "narrow delineation of the standard of nondeductibility" set forth in *Tellier* (see *James B. Carey*, 56 T.C. 477 (1971), affirmed per curiam 460 F. 2d 1259 (C.A. 4, 1972)) in terms of the seriousness of the purported crime involved. That counterfeiting is a serious crime within the contemplation of declared national policy is beyond question. United States Constitution, art. 1, sec. 8, cl. 6 (18 U.S.C. sec. 471 (1970)).

The obvious reply to the contention that my approach may involve "the task of grading criminal activity" is that, to the extent that this may be the result, the courts will simply be dealing with another instance of line-drawing which is part of the daily grist of judicial life. See *Harrison* v. *Schaffner*, 312 U.S. 579, 583 (1941).

DAWSON and RAUM, *JJ.*, agree with this concurring opinion.

---

FEATHERSTON, *J.*, dissenting: I have joined in Judge Sterrett's dissenting opinion, but I add that I do not think the facts show that petitioner was a party to any conspiracy to counterfeit United States currency. He and his covictim knew they could not counterfeit currency. The other parties pretended that they could and would use

their black box for currency reproduction purposes, but they knew the box could not be so used. Thus, there was no conspiratorial agreement between petitioner and anyone who actually intended to do any counterfeiting. The whole scheme was designed to defraud petitioner of his money, and that is what happened. His intentions may have been evil, but that is no ground for denying him a tax deduction. In my opinion, the case is controlled by *Edwards* v. *Bromberg*, 232 F. 2d 107, 111 (C.A. 5, 1956), now deeply imbedded in the tax law and heavily reinforced by the subsequent Supreme Court decisions cited in Judge Sterrett's dissent. I do not think the Court should decline to follow that precedent.

FORRESTER, STERRETT, and HALL, *JJ.*, agree with this dissent.

---

STERRETT, *J.*, I respectfully dissent from the majority opinion for the following reasons:

In *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30, 33, 35 (1958), the Supreme Court laid down the test for denying a deduction on the grounds of public policy. An otherwise allowable deduction may be denied if allowance would "severely and immediately" frustrate "sharply defined national or State policies proscribing particular types of conduct, evidenced by some governmental declaration thereof." Frustration of a particular State policy "is most complete and direct when the expenditure for which deduction is sought is itself prohibited by statute." *Tank Truck Rentals* v. *Commissioner*, *supra* at 35. If the expenditure is payment of a penalty imposed by the State because of an illegal act, allowance of a deduction would clearly frustrate State policy by reducing the "sting" of the penalty imposed. Accordingly, the Supreme Court disallowed the deduction of fines the taxpayer had paid during the course of its trucking operations. The Court said, "To allow the deduction sought here would but encourage continued violations of State law by increasing the odds in favor of noncompliance." *Tank Truck Rentals* v. *Commissioner*, *supra* at 35.

In *Commissioner* v. *Sullivan*, 356 U.S. 27 (1958), decided the same day as *Tank Truck Rentals*, the Court refused to disallow the deduction of rent and wage expenses in operating an illegal bookmaking establishment. The Court stated, "The fact that an expenditure bears a remote relation to an illegal act does not make it nondeductible." *Commissioner* v. *Sullivan*, *supra* at 29. See also *Commissioner* v. *Heininger*, 320 U.S. 467 (1943); *Lilly* v. *Commissioner*, 343 U.S. 90 (1952). Once again in *Commissioner* v. *Tellier*, 383 U.S. 687, 694 (1966), the Supreme Court reiterated and emphasized its position that an otherwise allowable deduction should only be disallowed when in

violation of a public policy that is sharply limited and carefully defined.

Against this background, Congress as part of the Tax Reform Acts of 1969 and 1971 attempted to set forth categories of expenditures within the purview of section 162 which were to be denied on the grounds of public policy. The Senate Finance Committee report for the 1969 Tax Reform Act states "The provision for the denial of the deduction for payments in these situations [1] which are deemed to violate public policy is intended to be *all inclusive*. Public policy, in other circumstances, generally is not sufficiently clearly defined to justify the disallowance of deductions." (Emphasis added.) S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 597. In expanding the category of nondeductible expenditures, the legislative history of the 1971 Tax Reform Act states, "The committee continues to believe that the determination of when a *deduction* should be *denied* should remain under the *control* of *Congress*." (Emphasis added.) S. Rept. No. 92–437, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 599.

While the above statements have direct effect under section 162, where most of the public policy decisions have arisen, it does seem to call for judicial restraint in other areas where Congress has not specifically limited deductions. Moreover, such statements may have been a reaction to widely varied decisions such as those in *Edwards* v. *Bromberg*, 232 F. 2d 107 (C.A. 5, 1956), and *Luther M. Richey, Jr.*, 33 T.C. 272 (1959), which we think are not fairly distinguishable, and have led to the disparate results so inimical to the uniform administration of the tax laws.[2]

Despite the above, the majority seeks to invoke public policy as the tool to deny the petitioner an otherwise allowable theft loss. While congressional intent could logically be read to remove public policy considerations from the Internal Revenue Code where not specifically included,[3] at a minimum the strict test laid down by the Supreme Court must be met.

In the majority opinion, as in *Richey*, we apparently pay lip service to the Supreme Court by stating "that to allow the loss deduction would constitute an immediate and severe frustration of the clearly defined policy against counterfeiting obligations of the United States." Unfortunately in both cases we fail to discuss precisely how that frustration will occur. In the case of illegal payments such as bribes

---

[1] Fines, a portion of treble damages under antitrust laws, bribes to public officials, and other unlawful bribes and kickbacks.

[2] We note that our decision in *Richey* did not mention or discuss *Edwards* v. *Bromberg*, 232 F. 2d 107 (C.A. 5, 1956), decided 3½ years earlier.

[3] Sec. 902, Tax Reform Act of 1969 had retroactive effect with respect to fines, penalties, and bribes and kickbacks to Government officials. See sec. 902(c), Pub. L. 91–172 (Dec. 30, 1969), 1969–3 C.B. 147.

and kickbacks and the payment of fines, we are able to see a direct relationship between the allowance of the deduction and encouragement of continued violations of the law. In essence, the Government underwrites a portion of the expenses. However in the instant case we cannot see how counterfeiting will be encouraged in any manner by allowing the petitioner a theft loss deduction arising out of a distinctly different act. At best, the relationship is more remote than that in *Sullivan*, for the term "theft" presupposes that the victim has not voluntarily parted with his property.[4]

The majority seems to indicate that a deduction can be denied where there is *any* relationship between the loss or expense and the illegal activity, a position specifically rejected by *Sullivan*. Such reasoning does not readily lend itself to being "sharply limited" or "carefully defined." Had petitioner contracted pneumonia on his New York excursion, would the majority also deny him a medical expense deduction?

Or assume that customers on the premises of the bookmaking establishment involved in *Sullivan* were robbed by an outside intruder. Would the majority deny them a theft loss because they were engaged in an illegal activity? Or would the majority have this Court of special jurisdiction add to its assigned duties of interpreting the Internal Revenue Code the task of grading criminal activity, a task for which we obviously have no particular expertise. The authority for undertaking such additional duties remains obscure to me and would also be, I suspect, obscure to Congress.

Congress has authorized the imposition of severe punishment upon those found guilty of counterfeiting United States currency. It is designed to repress such criminal conduct. In the interest of uniform application of the Internal Revenue Code, where the frustration of State or national policy is neither severe nor immediate, we must not be tempted to impose a "clean hands doctrine" as a prerequisite to deductibility. To hold otherwise, especially in light of the broad brushstroke of public policy applied by the majority opinion, makes the taxing statute an unwarranted instrument of further punishment.

FORRESTER, FEATHERSTON, HALL, and WILES, *JJ.*, agree with this dissent.

---

[4] This should be contrasted with the situation where a counterfeiter has money and equipment confiscated during a legal search by police. Allowance of a casualty loss would frustrate public policy by lessening the adverse affect of proper governmental action directly related to the counterfeiting. Cf. *Hopka* v. *United States*, 195 F. Supp. 474 (N.D. Iowa 1961).