JAMES D. LINCOLN and CLARA M. LINCOLN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lincoln v. Commissioner
Docket No. 10701-82.
United States Tax Court
T.C. Memo 1985-300; 1985 Tax Ct. Memo LEXIS 332; 50 T.C.M. (CCH) 185; T.C.M. (RIA) 85300; June 24, 1985. *332 Petitioner participated in a scheme to purchase stolen money at a discount. He was swindled by his cohorts who took his purchase money without producing any stolen money. Held: Petitioner may not deduct the money he lost under section 165(c)(2) or (3) because the allowance of the deduction would frustrate clearly defined national or state public policy. W. Leslie Sully, Jr., for the petitioners. Ronald D. Dalrymple, for the respondent. DRENNEN OPINION DRENNEN, Judge: This case is presently before the Court on respondent's motion for partial summary judgment on the single issue of whether petitioner is entitled to a deduction for a theft loss or a loss on a transaction entered into for profit for the year 1978. Section 165(c)(2) or (3). [1] *333 This issue was severed from the other issues in the case and was submitted under a statement of facts that was agreed on by the parties for disposition of this issue only. The deduction was first claimed on an amended return filed by petitioners for 1978. Respondent disallowed the deduction on the ground that to allow it would frustrate clearly defined national or state public policy. A summary of the facts agreed upon for purposes of this motion are as follows. Petitioners are husband and wife, who resided in Las Vegas, Nevada, at the time the petition was filed. They filed joint income tax returns for 1977 and 1978 with the office of the Internal Revenue Service at Ogden, Utah. During these years petitioner, James D. Lincoln (hereinafter James or petitioner), was involved in real estate investment in Nevada and a coal mining venture in West Virginia. In the latter part of 1977 James became involved with other individuals in a scheme to purchase what was purported to be stolen money. James was told by a co-conspirator that in exchange for $140,000 of "clean" money he could acquire between $600,000 and $1,000,000 of stolen or "hot" money. Unbeknownst to James there was no stolen money to be purchased and the other individual co-conspirators were carrying out a sophisticated scheme of their own to deprive James of $140,000. In mid February of 1978, at the instruction of one of the other individuals, James travelled to Washington, D.C. from Las Vegas carrying with him $140,000 of his own money with the full intention *334 of purchasing $600,000 to $1,000,000 of stolen money. In Washington he was told by a co-conspirator that the scheme could not be consummated at that time. James therefore returned to Las Vegas with his $140,000 intact and subsequently travelled to Hawaii on vacation carrying the $140,000 cash with him. In the latter part of February, 1978, James was contacted in Hawaii by one of his purported partners in the enterprise. James was informed that the scheme to purchase the stolen money had been arranged and that he should return to Washington to consummate the purchase. James immediately departed for Washington carrying his $140,000 with him in a briefcase. Upon arrival, James was taken by his purported partner to the Union Station in Washington where he was introduced to another individual who very beiefly exhibited to James the contents of a briefcase he was carrying, which appeared to be stacks of $100 bills.At least one of the stacks did consist of $100 bills, which James was probably shown, but the others consisted of $1 bills with one $100 bill on top. As per his instructions James gave his briefcase containing his $140,000 to the other individual and was told to stay where *335 he was until the other individual could count James' money. The other individual walked away to another part of the station with both briefcases. He appeared to stop before a locker and started to open it when he was seized by several uniformed Washington D.C. policemen who arrested him and confiscated both briefcases, one of which contained petitioner's money. The arresting officers who staged the fake arrest were actually Washington, D.C. policemen who participated for a fee in the scheme to relieve petitioner of his money. Fearing that he himself might also be arrested for his part in attempting to purchase and transport stolen money, petitioner hastily departed Washington and returned to Hawaii without his $140,000. Petitioner never did receive any part of the purportedly stolen money nor did he recover any part of his $140,000. Petitioners did not claim a loss deduction for the $140,000 on their original income tax return for 1978 but claimed such in the amount of $139,900 on an amended return filed on or about February 12, 1980, at which time petitioners' original income tax return for 1978 was under examination by respondent. On February 19, 1982, a statutory notice of deficiency *336 was issued to petitioners wherein respondent determined, among other things, that petitioners' claimed "casualty (theft) loss" should be disallowed in its entirety. In their petition, petitioners claimed error in this determination. In his motion for partial summary judgment respondent concedes, for purposes of the motion only, that petitioners sustained a loss during 1978 that they would normally be entitled to claim as a deduction under section 165(c)(2) or (3). Respondent claims, however, that under the factual circumstances presented herein petitioners' loss was the result of activity in contravention of clearly defined national and state policies and the allowance of a tax deduction for such loss would result in the frustration of these policies. Section 165(c)(2) allows a deduction for losses incurred in any transaction entered into for profit, and section 165(c)(3) allows a deduction for losses arising from theft. There are no statutory limitations on these allowances that are here relevant. However, case law has imposed a limitation on various deductions if the allowance thereof would frustrate sharply defined national or state policies proscribing particular types of *337 conduct. Commissioner v. Heininger,320 U.S. 467 (1943); Tank Truck Rentals, Inc. v. Commissioner,356 U.S. 30 (1958); Richey v. Commissioner,33 T.C. 272 (1959); Mazzei v. Commissioner61 T.C. 497 (1974). Since respondent agrees, for purposes of this motion, that the facts in this case would support a deduction for a theft loss in the amount of $139,900 under the normal meaning of the statute, the only question to be answered is whether the allowance of the deduction here would frustrate public policy. We conclude that it would and hold for respondent on this issue. To bring the public policy exception into play there must be a severe and immediate frustration of public policy, Tank Truck Rentals, Inc. v. Commissioner,supra,356 U.S. at 35, and the mere fact that an expenditure bears a remote relationship to an illegal act does not make it non-deductible. Commissioner v. Heininger,supra,320 U.S. at 474. The statutory laws of Washington, D.C. (where the purchase of the stolen money was supposed to occur), and of Nevada (where petitioner lived) both make it a crime punishable by imprisonment to buy or receive stolen money and other property knowing or having cause to believe that *338 such money or property was stolen. See District of Columbia Code, section 22-2205, and Nevada Revised Statutes, section 205.275. Also Title 18, section 2315, United States Code, makes it a crime, punishable by fine or imprisonment, to receive, conceal, etc., money or property which constitutes interstate commerce, knowing the same to have been stolen. James clearly intended to, and attempted to, violate each of these laws by buying money which he was told had been stolen and transporting it from Washington, D.C. to Nevada and Hawaii. There can be little doubt that these penal statutes evidence a policy of the pertinent jurisdiction prohibiting the purchase and receipt of stolen goods knowing them to have been stolen. Richey v. Commissioner,33 T.C. 272 (1959); Mazzei v. Commissioner,61 T.C. 497 (1974); United States v. Winters,261 F.2d 675 (10th Cir. 1958). These are policies evidenced by governmental declarations. See Tank Truck Rentals, Inc. v. Commissioner,supra;Commissioner v. Tellier,383 U.S. 687 (1966). The loss sought to be deducted in this case was of money intended to be used directly in the perpetration of the illegal act. The cases from which the public policy exception *339 to allowance of deductions otherwise allowed by law has evolved might appear to be somewhat ambiguous, but a careful analysis of the circumstances in these cases justifies the distinctions made.One line of cases involves the deduction of expenditures that were only remotely or peripherally related to the course of conduct proscribed by Federal or state statute. Prominent among these cases are Commissioner v. Heininger and Commissioner v. Tellier, both supra.Both involved the deductibility of legal and other expenses of defending against charges of violating Federal laws -- mail fraud in Heininger and securities exchange in Tellier.Both allowed the deduction based on the finding that the expenses were ordinary and necessary and perfectly legitimate expenses that anyone in similar circumstances would likely incur, and that the expenditure was not directly related to the illegal conduct. In Commissioner v. Sullivan,356 U.S. 27 (1958), the Court allowed deductions for rents, wages, etc. incurred in operating an illegal "bookie" enterprise, finding them to be ordinary and necessary expenses of conducting an illegal, but nevertheless taxable enterprise. Edwards v. Bromberg,232 F. 2d 107 (5th Cir. 1956) *340 dealt with the deductibility as a theft loss of money paid to a swindler to purportedly bet on a "fixed" horse race. The race was not fixed, the money was not bet -- the swindler just walked off with it. In allowing the deduction the court stressed the fact that the IRS had taxed the swindler on the money he received from the taxpayer, and it would be illogical not to allow the person swindled a deduction therefor.[2]Heininger,TellierSullivan, all emphasized that the income tax is a tax on net income, and that to disallow the ordinary cost of earning the income would be taxing gross income, which was not justified unless specifically authorized by statute or regulation. Another line of cases, including Tank Truck Rentals, Inc. v. Commissioner,supra and Holt v. Commissioner,69 T.C. 75 (1977), affd. 611 F.2d 1160 (th Cir. 1980), involved the deductibility of fines, penalties and forfeitures specifically imposed by state laws for violation of highway maximum weight laws and dealing in marijuana. The courts recognized that these penal statutes *341 were clear pronouncements of state policies prohibiting certain conduct and providing punishment for violations thereof. The fines and penalties imposed were intended to prevent persons from engaging in the proscribed conduct, for the benefit of the state and its citizens. To allow a deduction for the fines and penalties, and for the value of the goods forfeited, would encourage continued violations of the state laws by increasing the odds in favor of non-compliance, would tend to destroy the effectiveness of those laws, and would dilute the efficacy of the punishment. The third line of cases is similar to the case under consideration here. They involve the deductibility of losses suffered from participation in certain nefarious and illegal schemes such as the one in this case. In Richey v. Commissioner,supra, the taxpayer entered into a scheme to counterfeit U.S. $100 bills. He provided the bills that were to be duplicated. The scheme did not work and his cohorts departed with the real money. In disallowing a theft loss deduction on the grounds of public policy, we said that when acts are condemned by law and their commission is made punishable by fines or forfeitures, to *342 allow the deduction would reduce and in part defeat the prescribed punishment. The test of non-deductibility is the severity and immediacy of the frustration of public policy resulting from allowance of the deduction. We found that the Federal statute against counterfeiting clearly established a firm policy to prevent the type of conduct engaged in by the taxpayer and to punish such acts when they occur. The Court found the taxpayer's conduct constituted an attempt to counterfeit, a commencement of the counterfeiting activity, and the performance of overt acts looking to the consummation of the counterfeiting scheme in which the taxpayer actively participated. The taxpayer's actions were no less a violation of public policy because there was also another scheme, that of swindling the taxpayer. To allow the deduction, we found, would constitute a severe and immediate frustration of clearly defined public policy against counterfeiting obligations of the United States. Another in this line of cases is Mazzei v. Commissioner,supra, a Court reviewed case which involved the same type of scheme as that used in Richey, and in which the majority opinion relied heavily on Richey in denying *343 the deduction. We stated: "[T]he fact that the petitioner was victimized in what he thought was a plan or conspiracy to produce counterfeit currency does not make his participation in what he considered to be a criminal act any less violative of a clearly declared public policy." 61 T.C. at 501. Judge Dawson, in a concurring opinion, found nothing in Tellier or any other pronouncement of the Supreme Court that pointed to a contrary result. He distinguished Tellier, which he found to be based on a refusal to tax gross income, and also pointed out that in Mazzei the Court was not dealing with the income from a criminal enterprise, but only with a loss of capital invested in a scheme to counterfeit. Also, Judge Tannenwald's concurring opinion pointed out that there is a distinction between payments that are interwoven with the criminal act, such as in Mazzei, and payments of an inherently innocent character, such as rent, wages and legal fees. Another similar case is United States v. Winters,supra, where the issue was whether the cost of whiskey bought and used in Oklahoma, a dry state, by an attorney to entertain his clients was deductible as an ordinary and necessary expense of *344 his legal practice. The court found the expenses to be ordinary and necessary but disallowed the deduction on the ground that to allow it would be to frustrate the public policy of Oklahoma. [3] The Court pointed out that the taxpayer deliberately and knowingly patronized an illegal business and by reason of such patronage there was a severe and immediate frustration of state policy.
We distill from the above case law that although an expenditure may qualify as a theft loss under section 165(c)(3) it may not be deductible if allowance of the deduction would frustrate sharply defined national or state policy which proscribes particular forms of conduct and which is evidenced by some governmental declaration. The frustration of policy resulting from the allowance of the deduction must be severe and immediate. The expenditure must be directly related to the violation *345 of the public policy; the fact that the expenditure bears a remote relationship to an illegal act does not make it nondeductible. The rule must be applied with flexibility so that it does not result in taxing gross income rather than net income. This results in a distinction being made in the allowance of expenses of operating a business and losses incurred in transactions entered into for profit, where the loss is a loss of capital. [4] Each case must stand on its own facts, the primary test being the severity and immediacy of the frustration resulting from allowance of the deduction. [5] The schemes involved in Richey and Mazzei *346 are very similar to the scheme which resulted in the loss to petitioner in this case and we find those cases to be controlling of our decision here. Petitioner knowingly and willingly attempted to participate in a scheme to buy stolen property knowing such scheme was illegal. He actively engaged in the enterprise, twice travelling to Washington to exchange his legitimate money for considerably more stolen or "hot" money. He carried out his part in this transaction by handing over his money. It was only later that that he realized he was being duped and that he would receive nothing of value in exchange for his $140,000 in cash. He knew he was involved in a criminal act because he immediately left for home without making any effort to regain his money. To allow him to deduct his loss for tax purposes would greatly reduce his loss and defeat the purpose of the statute to prevent trafficking in stolen goods. It would not only encourage this taxpayer and others to enter into transactions like this to "make a fast buck" but it would also cost the government and other taxpayers the amount of his savings in income tax. The fact that James had been swindled and there was no stolen money *347 to be bought should make no difference. See Richey and Mazzei,supra. It is just as important to the policy of the state and nation to prevent attempts to buy stolen goods as it is to prevent an actual purchase. James' actions in participating in a scheme that he knew was illegal was no less violative of public policy than it would have been had the scheme been consummated. Respondent's motion for partial summary judgment on this issue will be granted. An appropriate order will be entered.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.
2. In Mazzei v. Commissioner,61 T.C. 497, 502 (1974), this Court stated that "we do not feel constrained to follow Edwards v. Bromburg.↩"
3. Compare Tank Truck Rentals, Inc. v. Commissioner,356 U.S. 30, 33↩ (1958), wherein it is said "A finding of necessity cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct evidenced by some governmental declaration thereof."
4. But see footnote 8 in Medeiros v. Commissioner,77 T.C. 1255, at page 1262, where we said: "There is some question whether the public policy doctrine retains any vitality since the enactment of sec. 162(f). If sec. 162(f) was intended to supplant the public policy doctrine, in all lokelihood it would disallow deductions under sec. 165(c)(1)↩ as well as sec. 162(a) since both involve an expenditure incurred in a trade or business.
5. See also Lafayette Extended Care, Inc. v. Commissioner,T.C. Memo. 1978-233. But see Hossbach v. Commissioner,T.C. Memo. 1981-291↩.