PAUL DAMSKI, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54929.   Filed October 8, 1957.

*Herbert Granoff, Esq.*, for the petitioner.
*John M. Doukas, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax and additions to the tax under section 293 (b) of the Internal Revenue Code of 1939 for the taxable years ended December 31, 1944 and 1945, in amounts as follows:

| *Year* | *Deficiency* | *Addition* |
| --- | --- | --- |
| 1944 | $13, 352. 29 | $6, 676. 15 |
| 1945 | 19, 086. 90 | 9, 543. 45 |

The issues are: (1) Whether petitioner understated his net income for the years 1944 and 1945 in the amounts of $25,761.78 and $27, 729,[1] respectively; (2) whether respondent erred in disallowing $600 in 1944 and $500 in 1945 claimed by petitioner in each of his returns as deductions for traveling and entertainment expense; (3) whether respondent erred in disallowing $1,990 in 1945 claimed by petitioner in his return for that year as general expenses; and (4) whether any part of any deficiency is due to fraud with intent to evade tax.

Petitioner contends he did not understate his income in either year; that he is entitled to all the deductions he claimed; and that, consequently, there are no deficiencies or additions to the tax.

### FINDINGS OF FACT.

Petitioner is an individual.   He resides in New York, New York. He filed his income tax returns for the taxable years ended December 31, 1944 and 1945, with the then collector of internal revenue for the third district of New York.

---

[1] Respondent now concedes that he erred in determining that petitioner understated his income for 1945 by as much as $27,729, and that such understatement amounted only to $19,348.56 instead of $27,729.

1

Petitioner started a business as a watch jobber during July 1944, operating in New York City as an individual proprietorship under the name of Paldam Watch Co.

Petitioner maintained his business records and filed his tax returns on an accrual basis.

Petitioner reported a net income for 1944 of $4,892.80 and a net income for 1945 of $14,189.31. Respondent determined that petitioner understated his net income for these years by $25,761.78 and $27,729, respectively, and in a statement attached to the deficiency notice he explained his determination as follows:

Item (a) In the absence of adequate records an increase in your taxable net income has been computed by reference to the bank deposits credited to your business capital account and personal expenditures made on behalf of your business with proper adjustment for non-taxable receipts.

Your reported taxable income has been increased by $25,761.78 and $27,729.00 for the years 1944 and 1945, respectively, computed as shown below:

|  | 1944 | 1945 |
| --- | --- | --- |
| Gross receipts deposited in bank and credited to business capital account | $50,125.00 | [2] $25,872.00 |
| Gross receipts not deposited but credited to business capital account for personal expenditures made on behalf of business | 14,211.87 | 3,158.50 |
| Total gross receipts | 64,336.87 | 29,030.50 |
| Less: Nontaxable receipts representing accounts receivable erroneously credited to your capital account and included in above-stated gross receipts deposited amount | 38,575.09 | 1,301.50 |
| Understatement of net income | 25,761.78 | [3] 27,729.00 |

On or about July 1, 1944, when petitioner commenced doing business as Paldam Watch Co., he engaged an accountant to open up a set of books for him. These books consisted of (1) a purchase and sales journal and cash ledger, (2) a general journal and ledger, and (3) a subsidiary accounts receivable and accounts payable ledger. In addition, petitioner kept a copy of all purchase and sales invoices and a checkbook.

The accountant recorded in the books every sale and every purchase without any exceptions. Such sales and purchases as shown by the books were reported in the returns filed by petitioner without any exceptions.

During the 6 months in 1944 prior to the time petitioner started his Paldam Watch Co. business, he earned the sum of $1,200 in the way of commissions for various transactions. Petitioner reported such commissions as income in his 1944 return. With the exception of this item

---

[2] Respondent now concedes that his determination of "gross receipts deposited in bank and credited to business capital account" for 1945 of $25,872 was in error to the extent that such gross receipts were only $17,491.56 instead of $25,872.

[3] Automatically changed to $19,348.56 instead of $27,729 by reason of concession mentioned in footnote 2.

of commissions, all of petitioner's income for the years 1944 and 1945 was derived from his Paldam Watch Co. business.

During the years 1944 and 1945, the books of the Paldam Watch Co. business disclosed that petitioner had deposited in the bank and credited to his capital account certain amounts in excess of the deposited collections from sales and had also credited his capital account with other amounts which he had advanced to pay for either the cost of materials or expenses. The net of these amounts credited to his capital account amounted to $25,761.78 in 1944 and $19,348.56 in 1945. Approximately $9,300 of such deposits in 1944 represented redeposits of sums petitioner had previously withdrawn to pay for purchases that did not materialize. The source of the remaining so-called unexplained credits to petitioner's capital account came from funds which petitioner brought with him when he emigrated to the United States from Germany in 1933, as more fully set forth below.

Petitioner was born in Lithuania in 1895. He was educated at the Hebrew Seminary at Kovno. In the latter part of 1918 he and his family moved to Germany during a forced migration. From 1919 to 1933, petitioner lived in Berlin and in 1924 he became the director of all sporting events at the Berliner Sports Palast. As such director, petitioner made substantial sums of money. When Hitler became dictator in March 1933 petitioner fled to Paris. Before petitioner left Germany he had made arrangements with one Sam Urievitch with respect to getting his money out of Germany. Urievitch was not a German citizen. Petitioner turned over to Urievitch at the Wolff Banking Company in Berlin German marks which were the equivalent of about $80,000. In Paris, petitioner contacted one George Koifman, who, after deducting a fee, delivered to petitioner in American dollars something over $70,000.

Petitioner stayed at the Hotel Bohy-LaFayette in Paris from March to October 1933. During his stay at the hotel he kept the approximately $70,000 of cash received from Koifman in a safe-deposit box at the hotel.

Petitioner arrived in the United States in October 1933 accompanied by Walter Neusel. Petitioner brought the approximately $70,000 in cash with him in a money belt fastened around his body. He was met at the boat by an uncle. Petitioner, his uncle, and Neusel, upon leaving the boat, went to the Governor Clinton Hotel in New York. There petitioner deposited his money in a safe-deposit box at the hotel. Except for one short trip of about 17 days, petitioner remained at the Governor Clinton Hotel until about May 6 or 7, 1934, when he returned to Paris to bring his family to the United States.

During the period from October 1933 to May 1934, petitioner and his closest friend, one Adolph Robins, spent a great deal of time together.

This friendship began about 1925 in Berlin and continued until Robins's death on December 18, 1950. Robins, who was an international vaudeville entertainer, was a man of considerable wealth. About the middle of April 1934, petitioner made arrangements with Robins to keep petitioner's approximately $70,000 in Robins's safe-deposit box while petitioner was in Europe. The money was wrapped in brown paper and sealed with red wax. On the outside of the package it was written "Belongs to Paul Damski." Robins then gave petitioner a receipt for the money. Robins kept the sealed package in his safe-deposit box until sometime in July 1944 when a settlement was had between petitioner and Robins, as hereinafter described.

Petitioner returned to Europe about May 6 or 7, 1934, and remained there until March 1935 when he returned to the United States with his family, on a permanent basis. While in Europe, petitioner staged several important boxing matches which netted him about $24,000. Upon his return to the United States, he left about $10,000 with the Lloyds Bank in London.

Upon petitioner's return to the United States in March 1935, he resumed the business of managing prize fighters. With the exception of the $1,200 of commissions received during the first 6 months of 1944, this constituted his sole business until he began the watch business in July 1944.

Petitioner's earnings from his prize fighting business after 1935 were not sufficient to take care of his living expenses. Before 1944, petitioner had withdrawn his funds from the Lloyds Bank and had requested and received advances from Robins from time to time to the extent of $18,000. When petitioner decided to go into the watch business in June 1944, he received from Robins a further sum of $5,000.

About the middle of July 1944, a settlement was had between petitioner and Robins. Up to this time, the seal on the package containing approximately $70,000 had not been broken. The sealed package was taken to the home of Robins where it was opened. Robins was paid the $23,000, which was the amount he had previously advanced to petitioner, and petitioner took the remaining approximately $47,000 to his home for the night. The following morning he took it to the Mid-Town Jewelers Exchange where he had a safe-deposit box and placed it therein. It was from this source that petitioner made the "remaining so-called unexplained credits" referred to previously in these findings.

Petitioner did not understate his net income for the years in question by the amounts of $25,761.78 and $19,348.56, respectively, as determined by the respondent.

In his returns for 1944 and 1945, petitioner deducted as ordinary and necessary business expenses the amounts of $600 and $500, re-

spectively, as representing traveling and entertainment. The respondent disallowed the deductions "for lack of substantiation." During the year 1944, petitioner actually expended in connection with his business for travel and entertainment, cash in the amount of $250.

In his return for 1945, petitioner deducted as "General expenses" the amount of $1,990. The respondent disallowed the deduction "for lack of substantiation." During the year 1945, petitioner actually expended in connection with his business cash in the amounts of $125 for accessories; $200 for entertainment and carfare; and $10 for freight, or a total of $335, which he included as a part of the amount of $1,990 deducted as general expenses.

No part of any deficiency in tax for either year is due to fraud with intent to evade tax.

The stipulation of facts filed by the parties is incorporated herein by reference.

OPINION.

The principal question is whether petitioner grossly understated his income for the two years in question.

With the exception of the $1,200 of commissions, petitioner's only source of income during the taxable years was from his watch business which he started on or about July 1, 1944. At that time petitioner employed an accountant to open up a set of books for the purpose of recording his business transactions. The accountant recorded, without any exceptions, every sale and every purchase. The returns were filed in exact accordance with the books. The respondent was unable to find a single instance where the books did not properly record all sales and all purchases.

When respondent examined petitioner's books in connection with his returns, he found recorded in the books certain credits to petitioner's capital account that he did not understand. These credits were of two kinds. First, there were certain bank deposits and, second, there were certain expenditures made on behalf of petitioner's business. The respondent was able to trace to the bank deposits certain nontaxable receipts but the excess of such deposits over the nontaxable receipts and all of the said expenditures were included by the respondent in petitioner's net income on the ground that petitioner's records were inadequate to show the source of such funds and no satisfactory explanation thereof had been made by the petitioner.

We think the facts set out in our findings clearly demonstrate that the so-called unexplained credits to the capital account were made up of two sources of funds, namely, the redeposits there mentioned, and the funds which petitioner brought with him when he emigrated to the United States in 1933. A repetition of such facts in this Opinion

would serve no useful purpose. Respondent's only explanation of such facts is that the evidence given in support thereof is unworthy of belief. Respondent has made the "unworthy of belief" assertion many times in his brief. Toward the close thereof he says:

This case is an excellent example of a case where direct and clearcut proof of fraud was not available. Respondent could not find one sale that was omitted from the books and records, nor could he find any inflated purchase. But even so the books and records were not "perfect." They contained as hereinbefore related, thousands of dollars of unexplained cash deposits credited to a capital account which was in reality a suspense account. No one could explain the source of this money except the petitioner, and he cannot be believed.

After a careful consideration of the entire record, we are satisfied that the testimony offered by petitioner and his witnesses should be accepted as true. Too many specific places, events, and names are mentioned to permit us to believe that the "fund from Europe story," as so characterized by the respondent, was a fabrication and a fraud. Petitioner's son Leo testified that he had knowledge of monies which his father had left in the custody of Robins and that he knew "it was a considerable sum." The widow of Robins, Irene Proper Todman, testified that Robins had told her of the sealed package belonging to petitioner; that she had access to the safe-deposit box which was in the joint names of herself and Robins; and that she saw the package. The substance of most of the testimony offered at the hearing herein had, from time to time, been submitted to respondent by petitioner either in affidavit form or orally at conferences held with respondent's representatives. Respondent began his examination covering the years in question on April 16, 1947, and concluded it with the deficiency notice on June 19, 1954. He had ample time to check the specific places, events, and names but all he can produce is to say that the evidence now offered by petitioner is unworthy of belief. We cannot accede to such a proposition. The evidence satisfies us that petitioner did not understate his net income in the amounts of $25,761.78 and $19,348.56 for the years 1944 and 1945, respectively, and we have so found.

As to issues (2) and (3), we hold, on the basis of the facts found in our findings, that petitioner is entitled to deduct $250 of the $600 deducted in 1944 for travel and entertainment; that petitioner is not entitled to any of the $500 deducted in 1945 for travel and entertainment; and that petitioner is entitled to deduct $335 of the $1,990 deducted in 1945 for general expenses. It may well be that petitioner could have substantiated all of these minor deductions disallowed by respondent but his counsel's efforts were so concerned with the principal question that he evidently overlooked the necessity for such substantiation. The small amounts we have allowed came from state-

ments in the stipulation and the books which were received in evidence.

In view of our holding as to issues (2) and (3), there will be a small deficiency due in both years. We hold that no part of such deficiencies is due to fraud with intent to evade tax.

*Decision will be entered under Rule 50.*