LAFAYETTE EXTENDED CARE, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT Lafayette Extended Care, Inc. v. Commissioner
Docket Nos. 3853-75, 3854-75, 5724-75.
United States Tax Court
T.C. Memo 1978-233; 1978 Tax Ct. Memo LEXIS 277; 37 T.C.M. (CCH) 995; T.C.M. (RIA) 78233; June 26, 1978, Filed *277 Due to impending changes in the Medicare Program, the owners and operators of a nursing home decided to sell the operating portion of the business. The owners redeemed 90 percent of their stock in exchange for most of the physical assets of the operating company and purchased the remaining equipment and fixtures. They sold their remaining 10 percent interest for $ 30,000, representing the net value of the company's tangible assets. Integrally related to the sale was a leaseback of all the equipment, a consulting agreement whereby the husband-seller was to render advice, and service contracts whereby the sellers performed essentially all of the services they previously rendered. Due to a change in government policy, the service contracts were cancelled. Six months after the sale, the purchaser and the wife-seller executed two documents, both entitled employment contract. The first contract created a current liability because it was payable in all events, including termination by either party, and was later modified because the purchaser wanted to go public. No services were ever intended to be rendered, nor in fact were rendered, under this second contract. Held, sellers have *278 met their burden to show the employment contract was a sham and represented the sale of the operating business, entitling them to capital gains treatment. Held,further, public policy does not bar the section 1202 deduction on the sale. Earl J. Cline for petitioners Lafayette Extended Care, Inc. and Kenneth L. & Phyllis M. Rabidoux and Bernard L. McAra for petitioners Caleb E. & Isabelle Calkins. Daniel J. Westerbeck, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in income tax as follows: Docket
Tax Years Nos.
Petitioners
Ended
3853-75
Lafayette Extended
$ 8,581.94
3-31-71
Care, Inc.
2,397.02
3-31-72
3854-75
Kenneth L. Rabidoux and
4,503.00
12-31-70
Phyllis M. Rabidoux
7,177.00
12-31-71
5724-75
Caleb E. Calkins and
303.00
12-31-70
Isabelle I. Calkins
9,831.00
12-31-71
The only issue presented for our consideration is whether payments received in 1970 and 1971 by Isabelle Calkins (hereafter Isabelle) were compensation for services, as recited in a written contract, or represented consideration for the sale of Lafayette stock by the Calkinses to Rabidoux. [2] Isabelle treated the amounts she received as capital gains while Lafayette Extended *279 Care (and Rabidoux) treated the amounts as compensation and deducted them as salary under section 162. [3] Respondent, in order to protect the revenue, determined that the amounts were taxable as ordinary income to Isabelle and nondeductible by Lafayette Extended Care. Respondent determined that the amounts paid by Lafayette Extended Care to Isabelle were dividends to Rabidoux (for payment to Isabelle for the purchase by Rabidoux of Lafayette Extended Care). Respondent takes the position here that the contract was for compensation for services. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioner Lafayette Extended Care, Inc. (hereafter Lafayette) is a corporation which had its principal place of business in Flint, Michigan at the time its petition herein was filed. It filed corporate income *280 tax returns for the fiscal years ending March 31, 1971 and March 31, 1972 with the Internal Revenue Service Center, Cincinnati, Ohio. Petitioner Kenneth L. Rabidoux resided in Flint, Michigan and petitioner, Phyllis M. Rabidoux resided in Grand Blanc, Michigan at the time their petition herein was filed. They filed a joint income tax return for the taxable years 1970 and 1971 with the Internal Revenue Service Center, Cincinnati, Ohio. Petitioners Caleb E. Calkins (hereafter Caleb) and Isabelle I. Calkins resided in Flint, Michigan at the time their petition herein was filed. They filed a joint income tax return for the taxable years 1970 and 1971 with the Internal Revenue Service Center, Cincinnati, Ohio. On October 17, 1963, the Calkinses organized Nursing Home Developers, Inc. (hereafter Developers) to construct and own a nursing home facility in Flint, Michigan. The Calkinses at that time owned 20 percent of Developers' stock but subsequently became its sole owners prior to December 1966. At the same time, the Calkinses organized Kith-Haven, Inc. (hereafter K-H) to operate the new nursing home facility. The Calkinses were the sole shareholders of K-H, and Caleb and Isabelle *281 each acquired 5,000 shares of common stock at $ 1 per share. In October 1966, K-H hired Kenneth Rabidoux as its manager. Rabidoux, however, had little experience in operating a nursing home at the time. Shortly thereafter, impending changes in the Medicare Program (to be effective January 1, 1967) threatened the profit potential of K-H if the Calkinses remained both owners (through Developers) and operators (through K-H) of the nursing home. The new rule, of which both Rabidoux and the Calkinses were aware, prevented Medicare from reimbursing the operator where the operator owned the facility. In December 1966, the Calkinses and Rabidoux discussed a bootstrap acquisition by Rabidoux of the Calkinses' stock in K-H. As of December 31, 1966, K-H had a net book value of $ 166,000. Net income before taxes for the fiscal year ending March 31, 1966, was $ 104,000 (yielding net income after taxes of $ 61,600). K-H was filled to capacity and Developers had agreed to expand the facility. The Calkinses agreed to sell the operating business to Rabidoux, who had little or no capital, retaining for themselves the physical assets of K-H. Goodwill was not carried as an asset on K-H's books, *282 nor was any value assigned to it on the sale. In December 1966, Caleb and Isabelle Calkins each sold 500 shares of K-H stock to Rabidoux for $ 30,000 (the approximate net value as of December 31, 1966, less the cost to K-H of reacquiring the Calkinses' 9,000 shares of stock). On December 28, 1966, Rabidoux executed a five-year personal note for $ 30,000 at 6 percent interest in favor of Caleb and Isabelle (which was paid in full by December 31, 1971). Shortly thereafter, K-H redeemed the Calkinses' remaining 9,000 shares of stock in exchange for the physical assets of K-H the Calkinses wished to retain. The assets had a book value of $ 394,408.88, and the Calkinses also assumed liabilities on the transfer totaling $ 200,832.14. On January 3, 1967, K-H sold all of its remaining equipment and fixtures to the Calkinses for $ 57,164.25. [4] On the same day, the Calkinses leased the same equipment and fixtures back to K-H for rental of $ 20,000 per year. The lease also provided that the rental would increase if and when additional equipment was supplied by the Calkinses. At the same time, K-H executed three separate contracts cancellable on 30 days' notice with Cabelle Services, Inc. *283 (owned entirely by the Calkinses and hereafter Cabelle) for food services, laundry and housekeeping services, and nursing services. Payments under these contracts were increased in 1967 due to higher overhead costs. In January 1967, Caleb contracted with K-H to serve as a consultant. The original terms of the contract provided for a salary of $ 1,000 per month. Subsequently, K-H and Caleb agreed to increase the compensation to $ 1,666 per month. Services were in fact performed under this agreement. On February 20, 1967, Rabidoux and the Calkinses executed an option agreement whereby the Calkinses obtained the right to repurchase Rabidoux's stock (at book value) in the event of Rabidoux's death or whenever Rabidoux ceased to be in K-H's employ. It further granted the Calkinses a right of first refusal in the event Rabidoux wished to sell his stock. Concurrently, the Calkinses granted Rabidoux an option to purchase their properties. Cabelle cancelled all of its contracts with K-H effective September 30, 1967, due to a change in *284 government policy which required a service company to provide services to more than one customer in order to qualify for Medicare reimbursement (K-H was Cabelle's only customer). In January 1968, K-H changed its name to Lafayette Extended Care Facility, Inc. due to pressure from the Calkinses who were displeased with Rabidoux's handling of the business and did not want their names associated with it. The next month Lafayette sent out a public notice stating that the Calkinses were no longer actively participating in the business. In March 1968, Lafayette and Isabelle executed two documents (dated January 1, 1968), both entitled employment contract. Both contracts provided that Isabelle was to be employed as a nurse and advisor to be paid $ 15,000 annually over ten years, adjusted annually to the cost of living index. Each further provided that the contract was to be binding and to be paid by Lafayette to Isabelle notwithstanding any disability which might occur to Isabelle. In the event of Isabelle's death, Lafayette agreed to pay the remaining balance on the contract either in a lump sum or on a monthly basis to Isabelle's estate. Only the first contract contained a clause requiring *285 Lafayette to pay the money due on the contract either in a lump sum or on a monthly basis in the event either party terminated the contract prior to the expiration date. The second contract (without this sentence) superseded the first. Isabelle agreed to delete the sentence because Rabidoux wanted to make a public offering of Lafayette stock, and Rabidoux's accountant objected to the language because he believed it created a current liability on Lafayette's books. Lafayette made payments to Isabelle under the agreement, withheld taxes from the payments, and included her in its pension plan until approximately February 9, 1970. After Lafayette's proposed underwriters discussed with Isabelle the possibility of cashing out the agreement in a lump sum, Isabelle sought tax advice from an attorney who advised Isabelle that the payments under the contract should be treated as gain from the sale of the business. [5] The attorney sent a letter to Lafayette on February 6, 1970. After such time, Lafayette continued the payments to Isabelle but did not withhold taxes from such payments and did not include Isabelle in its pension plan. [6] Isabelle never performed nursing services for Rabidoux *286 and in fact was never requested to do so until April 30, 1973, when Rabidoux wrote and asked her to work the 11:00 p.m. - 7:30 a.m. shift. Isabelle was then 60 years old and had not worked as a nurse since 1957 due to a radical mastectomy which left her without any muscles in her left arm. Although Rabidoux was aware of Isabelle's mastectomy, he was unaware of her physical impairment. When Isabelle refused to work, Lafayette stopped making payments on the contract (approximately May 5, 1973). At the same time that these employment contracts were entered into in March 1968, Caleb and Lafayette entered into a new consulting contract, thereby replacing the January 1, 1967, contract. It provided the same $ 1,666 per month compensation as did the former contract but added a cost of living escalator. The contract was to terminate *287 December 31, 1977 (i.e. 10 years), but Caleb had an option to renew for five years at that time. In the event of Caleb's death or disability, Lafayette was obligated to continue payments under the contract. As noted earlier, coinciding with the sale of K-H to Rabidoux was a planned expansion of the nursing home from a 164 bed capacity to a 238 bed capacity. Additional land needed for the expansion was owned by K-H, but on redemption by the Calkinses of their K-H stock the land to be used was transferred by K-H to the Calkinses, which was sold six months later to Developers. Isabelle spent a great deal of time working on the plans for the expansion. She worked with the architect and building contractor, and did most of the furniture and accessory buying for the new addition. Upon completion, she supervised the placing of all the furniture and equipment. The addition, new equipment, and fixtures were paid for and owned either by the Calkinses or Developers, and leased to Rabidoux. In early 1968, Rabidoux discussed with the Calkinses the possibility of building another facility. The Calkinses spent several months working with the architect on the design and layout of the building. *288 Isabelle worked on floor plan layouts and reviewed equipment needs. The facility was paid for and owned by the Calkinses and Rabidoux was to be the tenant. However, Rabidoux never occupied the new facility, and Isabelle's supervision on the project continued after Lafayette was no longer to be the lessee. OPINION The only issue which we must decide is whether payments received by Isabelle from Lafayette under the second 1968 employment contract were compensation for services or represent part of the consideration for the sale. An initial matter with which we must deal is Lafayette's and Rabidoux's objection to admitting Isabelle's testimony, which objection respondent urges us to sustain relying on Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967), revg. 44 T.C. 549 (1965), for the proposition that a party can challenge the tax consequences of his agreement as construed by the respondent only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, or the like. However, the effect of Danielson *289 is limited to cases in which appeal would lie to the Third Circuit Court of Appeals and that is not the situation here. In Estate of Craft v. Commissioner,68 T.C. 249 (1977), on appeal to the Fifth Circuit, we set forth an analysis of the "parol evidence rule" (Danielson) and its application to tax cases. In that case, we held that the parol evidence rule applied to determine the admissibility of certain evidence where we had to determine the nature and extent of powers conferred on the grantor and the trustee under a trust instrument. The case at bar is clearly distinguishable. The powers of a trustee involve a state law determination of legal rights and interests created by a written interest under applicable state law. Here, however, we are faced with the question of whether an instrument is what it purports to be. In situations in which we apply the parol evidence rule as established in Estate of Craft,supra, it applies equally to respondent (if he attempts to raise it against the taxpayer) and to the taxpayer (if he attempts to raise it against respondent). [7]Because the substance of a transaction controls over its form, we noted at p. 263 that "we think our continued *290 liberal admission of extrinsic evidence is required in order that we base our decisions on the substance of the documents * * * rather than their form." It is clear that neither taxpayer could raise this objection against respondent, Lacy v. Commissioner,39 T.C. 1100 (1963), affd. 341 F.2d 54 (10th Cir. 1965); it follows that respondent should not be entitled to raise the objection against the taxpayer. Petitioners Lafayette and Rabidoux further argue that it is they, and not respondent, that are raising the parol evidence rule objection, and therefore, the necessary privity between parties is met. However, the parties misconstrue the nature of these proceedings. Although the cases herein were consolidated for trial and decision, Lafayette, Rabidoux, and the Calkinses are each involved in separate proceedings *291 with a taxpayer on one side and respondent on the other, not one proceeding involving the Calkinses against Rabidoux and Lafayette. Although we do not apply Danielson, the burden of proof on the Calkinses is, however, greater than that of overcoming the ordinary presumption attaching to respondent's determination. Contracting parties are normally bound by the terms of the contract and the form of the transaction, and if a taxpayer asserts that the substance of that transaction is different than the form he used, he must furnish "strong proof" that the substance and intent of the parties were other than the form indicates. Coven v. Commissioner,66 T.C. 295, 304-305 (1976); Pritchett v. Commissioner,63 T.C. 149, 171-173 (1974); Baldarelli v. Commissioner,61 T.C. 44 (1973). In October 1966, the Calkinses hired Rabidoux to manage the K-H nursing home facility. Due to a proposed Medicare regulation prohibiting reimbursement where there were combined ownership and operation of extended care facilities, the Calkinses were forced to divest one of the two functions, in order to keep Medicare patients. To solve this dilemma the Calkinses devised a plan where-by they redeemed 90 percent *292 of their stock in K-H and sold the remaining 10 percent to Rabidoux for $ 30,000. K-H then sold its remaining equipment and fixtures to the Calkinses for $ 57,164.25. At this point, K-H's only remaining assets on its books were cash, accounts receivables, a club membership, and an automobile; the Calkinses, on the other hand, retained title to virtually all of the assets of the business, including the assets needed in the operation of the nursing home. The building and all the equipment were then leased back to K-H. Simultaneously, the Calkinses established Cabelle, a service corporation, to provide K-H with dietary, nursing, and housekeeping services. In September 1967, the parties mutually cancelled the service contracts between Lafayette and Cabelle because new Medicare regulations required that a service corporation render services to more than one nursing home (Lafayette being Cabelle's only customer). [8] In March 1968, Isabelle signed a contract in which she was to be employed as nurse and advisor at $ 15,000 annually for 10 years. This contract, according to the Calkinses, was meant to replace the service contracts while at the same time provide for payment of the additional *293 stock sales price through Medicare reimbursements. The first employment agreement, superseded by the one in issue, is even more clearly not an employment agreement. The clause requiring Lafayette to pay the money due on the contract in the event that either party terminated the contract prior to the expiration date created a current liability rather than an employment contract for services to be rendered in the future. It was only because Rabidoux wanted to go public that this language was removed. Although it is the latter contract with which we are concerned, the change shows the mutuality of interest between the parties since it was made without arm's-length negotiation. In this context, this first contract goes far to show the true nature of the transaction. Indeed, the parties' common interest that Lafayette receive Medicare reimbursement *294 for the contract superseded their adverse interests as buyer and seller, and, in fact, spawned the sale of K-H. In this context, neither the Court nor respondent can rely on the adverse interests of the purchaser and seller to provide an accurate reflection of the substance of the transaction. As such, the second contract has no greater probative value than the first, and represents merely the end result of an agreement which was continually changed solely to effectuate the parties' mutual goal: every time there was a proposed adverse change in Medicare, the parties changed the agreement.[9] *295 In fact the only reason the second agreement was written was because of the problem created by an accounting entry.Cf. Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 1 (1957). Thus, if we look to the transaction in its totality, the documentation provides the necessary subterfuge in a deal constructed by the parties to achieve their joint end. Cf. Freeport Transport, Inc. v. Commissioner,63 T.C. 107, 113-114 (1974). Respondent next contends that because Rabidoux purchased the stock at a price approximating the net book value of K-H's assets (which because of the nature of its assets must have been carried at fair market value) the payments necessarily represent goodwill. Since, argues respondent, K-H had no goodwill, the payments must represent compensation. However, apart from goodwill a business may have a "going concern value" described as the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership. VGS Corp. v. Commissioner,68 T.C. 563 (1977); Computing & Software, Inc. v. Commissioner,64 T.C. 223 (1975). See also Los Angeles Gas & Electric Corp. v. Railroad Commissioner,289 U.S. 287, 313 (1933); United States v. Cornish,348 F.2d 175, 184-185 (9th Cir. 1965). It is both these concepts with which *296 we must deal, not goodwill alone. We believe that K-H retained its going concern value at the time of sale. The name (K-H) continued to be used in the business for one year and the Calkinses' name was associated with K-H. It was not until January 1968 that K-H changed its name to Lafayette (at the Calkinses' request) and there was a public notice stating that the Calkinses were no longer actively involved in K-H. Indeed, the Calkinses provided practically all the services to K-H through the service contracts that they had when they owned K-H.Thus, in spite of the stripping of the assets, Rabidoux purchased K-H as a going concern, the leaseback and service contracts being integrally related to the sale. Cf. Estate of Maddock v. Commissioner,16 T.C. 324, 330 (1951).At the time of sale, both parties expected the Calkinses to maintain close contact with K-H and provide not only services but management advice as well (which was, in fact, rendered by Caleb under the consulting contract). [10] It was not until relations between the parties soured that the Calkinses pulled out from K-H, forced a name change, and went into competition with Rabidoux. Indeed, it was not until after the *297 relationship soured that the Calkinses reported the gain as capital gain. We believe that K-H not only retained its inherent value as a going concern but must have had unrecorded goodwill as well. [11] *298 Goodwill has been variously defined as "nothing more than the probability that the old customers will resort to the old place," [12] and the expectancy of realizing in the future the high margin of profits produced in the past. [13] See also Grace Bros. v. Commissioner,173 F.2d 170 (9th Cir. 1949); Brooks v. Commissioner,36 T.C. 1128, 1133 (1961); Watson v. Commissioner,35 T.C. 203, 213 (1960). On these facts, we believe that the Calkinses intended to obtain a significant portion of the future profits of K-H. [14] This finding is further supported by the 10-year length of Isabelle's contract and the 15-year term (including a 5-year renewable term) in Caleb's consulting agreement, albeit the latter was treated by Caleb as ordinary income. Moreover, the business was extremely profitable and at the time of sale to Rabidoux there was a planned expansion.The profits continued unabated under Rabidoux's ownership.
We also believe the true nature of the agreement as a sales agreement is reflected in the fact that Isabelle never intended to render nursing services, being physically unable *299 to do so, yet the employment contract called for continued payment in the event of petitioner's death or disability, either in a lump sum or on a monthly basis to Isabelle's estate. Because there was an overriding mutual interest to procure Medicare reimbursement and no intent by Isabelle to provide nursing care, such language tends to show that the agreement was, in fact, for the sale of the business. Cf. Coven v. Commissioner,supra, at 304. Cf.also Ward v. United States,456 F.2d 354 (6th Cir. 1972); Wager v. Commissioner,52 T.C. 416, 419 (1969); Levinson v. Commissioner,45 T.C. 380, 391 (1966). Nor do we believe Rabidoux ever expected her to provide nursing services. At the time the contract was signed, Isabelle was 56 years old and had not worked as a nurse for over eleven years. Rabidoux did not ask her to work until April 30, 1973, and even then he required her to work only the 11:00 p.m. to 7:30 a.m. shift. Nor did Isabelle ever perform consulting or advisory services in the operation of the nursing home. Isabelle did spend a great deal of time working on the plans for the expansion (at the time of sale), and worked with the architect and building contractor. However, *300 the expansion was finished prior to the agreement at hand.The Calkinses also spent several months in early 1968 working with the architect and reviewing equipment needs of the planned facility which was to be leased to Rabidoux. Such work, however, was in the nature of her responsibilities as landlord.Isabelle continued to supervise the second project even after Lafayette was no longer to be the lessee. Moreover, the Calkinses' experience and knowledge of the special needs of a nursing home facility provided the architects with valuable aid in the plans. Respondent argues in the alternative that if we find in favor of the Calkinses, the section 1202 deduction attending the sale of K-H (a capital asset) should be denied because it would frustrate a sharply defined public policy. Without doubt, there is a clearly defined public Policy prohibiting the deception practiced by Isabelle and Rabidoux, both of whom were aware of the fraudulent nature of their arrangement and both of whom stood to gain from the designation of the sale as an employment contract. The test for disallowing deductions on grounds of public policy was stated by the Supreme Court in Tank Truck Rentals v. Commissioner,356 U.S. 30, 35 (1958): *301 "the test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction." There, the Court held that deduction of fines and penalties under section 162 would frustrate public policy by reducing the sting of the penalty prescribed. Thus, in those cases in which a fine or similar penalty was imposed, the rationale for denying a deduction is that the impact of the penalty as a deterrent would be softened and violations of statutory duty would be encouraged. See May v. Commissioner,65 T.C. 1114 (1976); Reuter v. Commissioner,37 T.C. 599, 601-602 (1961); Smith v. Commissioner,34 T.C. 1100, 1106 (1960), affd. 294 F.2d 957 (5th Cir. 1961). See section 162(f).
Another line of cases holds that items may not be deducted under section 162 where the expenditure for which the deduction is sought is itself prohibited by a statute, apparently without regard to whether a government imposed a fine or penalty for its violation. Textile Mills Corp. Commissioner,314 U.S. 326 (1941); Coed Records, Inc. v. Commissioner,47 T.C. 422 (1967); Boyle, Flagg & Seaman, Inc. v. Commissioner,25 T.C. 43 (1955). Cf. section 162(c); Alex v. Commissioner, 70 T.C.     (1978). *302 Deductions have also been disallowed under section 165 on public policy considerations. As in the section 162 cases, denial of deductions seems to fall into two categories. There are those cases in which a government has imposed a loss (for example, by forfeiture or confiscation), Holt v. Commissioner,69 T.C. 75 (1977); Holmes Enterprises, Inc. v. Commissioner,69 T.C. 114 (1977). If a deduction was permitted in these instances, the loss inflicted by a government would be borne in part by a government, thereby lowering the risk and burden of the loss. See also Fuller v. Commissioner,20 T.C. 308 (1953), affd. 213 F.2d 102 (10th Cir. 1954). There are other cases, however, in which a loss deduction was disallowed even though no government has imposed a financial loss on the taxpayer. In Mazzei v. Commissioner,61 T.C. 497 (1974), we disallowed a theft loss deduction where the taxpayer entered into a conspiracy to counterfeit U.S. currency but instead was swindled by his co-conspirators out of money he provided for the scheme. Our rationale was that to allow the loss deduction would constitute an immediate and severe frustration of the clearly defined policy against counterfeiting. *303 And once again, underlying this rationale is the concern that the financial risk of engaging in an illegal activity is lessened where a deduction is permitted for a loss incurred in that activity. See also Wusich v. Commissioner,35 T.C. 279 (1960); Richey v. Commissioner,33 T.C. 272 (1959); but cf. Commissioner v. Sullivan,356 U.S. 27 (1958). Finally, there are those cases which have disallowed deductions on public policy grounds when the section authorizing the deduction was enacted to provide relief for taxpayers in certain circumstances or promote various public ends. In Green v. Connally,330 F. Supp. 1150 (D.C. 1971), affd. per curiam sub nom Coit v. Green,404 U.S. 997, the court held that racially discriminatory private schools are not entitled to the Federal tax exemption under section 501 provided for charitable, educational institutions, and persons making gifts to such schools are not entitled to deductions for these gifts under section 170. The court noted that the benefits under sections 501 and 170 were enacted to help institutions serving the public good, and that these sections did not contemplate granting special benefits to trusts or organizations whose operations *304 contravene Federal public policy.In Turnipseed v. Commissioner,27 T.C. 758 (1957), we interpreted the dependency deduction under section 152(a)(9) to disallow such a deduction where the relationship between the taxpayer and the "dependent" violated strong public policy and constituted a criminal offense (a result later codified in section 152(b)(5)). In Commissioner v. Tellier,383 U.S. 687 (1966), the Supreme Court cautioned that the applicability of the public policy doctrine for denying a deduction should be narrowly construed. Respondent's argument that the section 1202 deduction should be disallowed is before this Court for the first time. It is unsupported by any regulation prohibiting the deduction, cf. Cammarano v. United States,358 U.S. 498 (1959), and Textile Mills Securities Corp.,supra, or by any statute, case, or ruling. Initially, we note it is not the sale of K-H (the operating business) to Rabidoux that was contrary to public policy, but rather disguising the sale as an employment agreement, and it is only this latter narrower question which we must resolve. And, of course, even this disguise will fail to provide the necessary capital gains treatment unless *305 the taxpayer gives up the subterfuge, as here, by claiming the transaction was a sale on her tax return, or the scheme is uncovered by Medicare and the taxpayer, having nothing to lose, thereafter files as though the transaction was a sale. We fail to see how allowing the section 1202 deduction in this instance would cause an immediate and severe frustration of the policy prohibiting Medicare fraud. The Government has imposed no fine or penalty on this type of sale transaction. Moreover, we do not believe that the financial risk of engaging in an illegal activity would be directly lessened were a section 1202 deduction permitted here: the property used in the scheme was not confiscated, lost, or stolen and the Government is not put in the position of having to reduce the loss through a tax deduction. The sale was not illegal.Medicare policy was, in effect, to force the divestiture that occurred here. Had the contract actually been what it purported to be, there would be no question that the section 1202 deduction would be allowed. Moreover, we are concerned about the implications of our disqualifying a section 1202 deduction for public policy considerations at least in this case. *306 If we were to adopt the rule espoused by respondent here, we would make the sale of certain businesses taxable as ordinary income rather than as capital gains. In any event, we feel that the policy reasons for enactment of section 1202 would not be undermined by application to the situation here. [15] This stands in contrast to the policy reasons which allow a deduction or loss and which might have unintended results if a deduction were allowed in the situations discussed previously. Cf. Green v. Connally,supra.
Decision will be entered for the respondent in Docket No. 3854-75.
Decision will be entered for the respondent in Docket No. 3853-75.
Decision will be entered for the petitioners in Docket No. 5724-75. Footnotes
1. Cases of the following petitioners are consolidated herewith: Kenneth L. Rabidoux and Phyllis M. Rabidoux, docket No. 3854-75; and Caleb E. Calkins and Isabelle I. Calkins, docket No. 5724-75.↩
2. Phyllis Rabidoux is a petitioner herein by reason of having filed a joint return with her husband. Hereafter, references to Rabidoux are to Kenneth L. Rabidoux. ↩
3. All statutory references are to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
4. After this sale, the only assets remaining on the books of K-H were cash, accounts receivables, club membership, and an automobile valued at $ 30,000.↩
5. More specifically, the letter stated that the agreement was tantamount to a covenant not to compete but that the covenant accompanied the transfer of goodwill and had no independent significance apart from assuring the transfer. ↩
6. Isabelle was unaware of the tax consequences of treating the agreement as an employment contract as opposed to a purchase agreement.↩
7. The Third Circuit, however, would not apply Danielson to prevent the Government from challenging the form of the transaction, at least where both parties are before the court. Lea, Inc. v. Commissioner,69 T.C. 762, 768 (1978); Freeport Transport, Inc. v. Commissioner,63 T.C. 107 (1974); Cf. Harvey Radio Laboratories, Inc. v. Commissioner,470 F.2d 118↩ (1st Cir. 1972).
8. While the service contracts were still in effect, Cabelle raised the cost of its services due to increased overhead. The Calkinses maintain that this was to protect the price paid by Rabidoux for the K-H stock. However, because one would expect higher prices to cover increased overhead in any service contract, this fact carries no probative weight.↩
9. Neither party considered the tax consequences of the agreement. Although Isabelle originally treated the amounts received as ordinary income, it is equally true that after Lafayette received a letter from Isabelle's tax attorney stating the contract was a sale, Lafayette no longer withheld taxes from the payments under the contract and removed Isabelle from its pension plan.Cf. Hamlin's Trust v. Commissioner,209 F.2d 761, 765 (10th Cir. 1954), affg. 19 T.C. 718↩ (1953).
10. Cf. Emmer v. Commissioner,T.C. Memo. 1978-102↩.
11. That K-H did not list goodwill as an asset is a "mere evidentiary fact" and not controlling. Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 860↩ (1976).
12. Schmitz v. Commissioner,51 T.C. 306 (1968), affd. 457 F.2d 1022 (9th Cir. 1972); Horton v. Commissioner,13 T.C. 143, 148↩ (1949). 13. Carty v. Commissioner,38 T.C. 46, 58↩ (1962). 14. We note that the Calkinses' attorney, upon whose advice Isabelle treated the contracts as a sale, wrote Isabelle that the contract was, in part, a covenant not to compete. Of course, we do not rely on that attorney's opinion in our determination. However, we believe at the time of sale both parties expected the Calkinses to take an active role in K-H and thus not compete. This in turn mitigates the admittedly short one-year period prior to the name change although, as it appears from K-H's success, this was either a sufficiently long time over which to develop goodwill or the customers looked to the place rather than to the individual owners or name. See Watson v. Commissioner,35 T.C. 203↩ (1960).
15. Various reasons have been advanced to support the special rate for capital gains. The most important concern seems to be that a high rate of tax will discourage investors from selling old investments and re-investing the proceeds. Similarly, a lower rate creates an incentive to taxpayers, despite being taxed, to invest.↩